Willie C. FREE, Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee.

No. 88–1710.

United States Court of Appeals,
Seventh Circuit.

Submitted March 14, 1989.

Decided July 19, 1989.

Willie C. Free, Marion, Ill., pro se.

Frederick J. Hess, U.S. Atty., East St. Louis, Ill., Laura J. Jones, Asst. U.S. Atty., Benton, Ill., for defendant-appellee.

Before CUDAHY, POSNER and COFFEY, Circuit Judges.

POSNER, Circuit Judge.

■ Willie C. Free, who is not free—who is serving a life term in the federal penitentiary in Marion, Illinois—brought suit against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, alleging that during a shakedown search of his cell, prison guards either negligently or intentionally destroyed various items of personal hygiene, including toothpaste and baby powder, plus a tennis shoe.

Free estimates the value of the items at $50. The parties consented to have the suit tried by a magistrate, see 28 U.S.C. § 636(c), who held a bench trial in the penitentiary and at its conclusion entered judgment for the United States. Free asked the magistrate for permission to appeal *in forma pauperis*, a status to which he is not entitled, despite his poverty, if the suit or appeal is frivolous or malicious. See 28 U.S.C. § 1915; Fed.R.App.P. 24(a); *Savage v. CIA*, 826 F.2d 561, 562 (7th Cir.1987). The magistrate denied Free's request, which he renews with us.

The request has no merit. The appeal is frivolous in the sense of utterly groundless; no basis for overturning the magistrate's decision is shown or appears from the record. Although not a lawyer or represented by counsel, Free is an experienced Federal Tort Claims Act litigant, and his inability to propose a colorable ground for appeal is telling.

His litigation experience brings us to the second and more interesting sense in which this is a frivolous suit and appeal. In the last two years alone, Free has filed twelve lawsuits in federal court, seeking relief under the Federal Tort Claims Act for alleged destruction of his personal property. He has threatened to bring a tort claims suit *every time* his cell is searched. By this threat it appears that he is trying both to deter the prison guards from searching his cell and to obtain replacements for lost, damaged, or worn-out items of personal property at the government's expense. This is an abuse of the judicial process in the classic sense of using the courts to pursue ends other than the vindication of claims believed to be meritorious. Abusers of the judicial process are not entitled to sue and appeal without paying the normal filing fees—indeed, are not entitled to sue and appeal, period. Abuses of process are not merely not to be subsidized; they are to be sanctioned.

Like other inmates at Marion, see *Tinker–Bey v. Meyers*, 800 F.2d 710 (7th Cir. 1986), Free is attempting to exploit a deficiency in the Federal Tort Claims Act. The Act has no floor on the amount in controversy, and as we noted in *Tinker–Bey*

bored or mischievous prisoners have brought suits under the Act for losses as minor as the loss of a comb. Such suits convert the federal courts into small-claims courts and prison lost-and-found departments. In a period of unprecedented federal judicial workloads, it is apparent that the responsibility for protecting the personal property of federal prisoners should be lodged elsewhere. We reiterate the suggestion we made three years ago in *Tinker–Bey*, and repeated in a different context (requests for waiver of fees under the Freedom of Information Act) in *Savage v. CIA, supra*, 826 F.2d at 563: Congress should give serious consideration to creating an exclusive rather than merely a preliminary administrative remedy for small tort claims by federal prisoners.

We are not suggesting that prisoners should have no legal rights, or that they should bear the entire brunt of necessary reforms of an overextended federal judicial system. Correctional officers have power, and power frequently is abused. The issue is the optimal remedy. Litigation in federal court is not a free good, and litigation by prisoners places heavy burdens not only on the courts themselves but on other litigants, whose cases are shoved farther back in the queue. At a time of staggering federal caseloads, the need to devise alternative remedies for classes of litigation that do not imperatively require the full Article III treatment is urgent; one of those classes is small tort claims by federal prisoners.

The request for leave to appeal *in forma pauperis* is denied, and the appeal is dismissed.

CUDAHY, Circuit Judge, concurring in the judgment.

Free seeks to overturn the results of the bench trial conducted by Magistrate Frazier based on a single argument: that "the District Court erred by giving considerable weight to the evidence and testimony presented by the Government, but very little to mine." Thus, in essence, Free asks this court to reweigh the credibility of witnesses whose testimony the magistrate saw and heard. As the Supreme Court has

stressed, however, a trial court's credibility determinations are entitled to considerable deference, except in those rare situations where the testimony the district court credits is internally inconsistent or otherwise implausible. *See, e.g., Amadeo v. Zant,* 486 U.S. 214, 108 S.Ct. 1771, 1777–80, 100 L.Ed.2d 249 (1988); *Anderson v. Bessemer City,* 470 U.S. 564, 573–76, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). Free makes no allegation that the testimony of the government's witnesses was incredible. Therefore, Free has failed to present any non-frivolous argument on appeal, and his petition to proceed *in forma pauperis* should be denied. I believe that this is a sufficient basis for ruling on Free's appeal; I therefore concur in the judgment.

I can see potential merit in relegating "small" tort claims to an administrative remedy, provided this can be done without unfairly disadvantaging the claimants. Unfortunately, I do not know enough about the subject to join in advocating such a program at this time, but I believe some related points should be noted with respect both to the majority opinion and to Judge Coffey's concurrence. First, whatever the merit of a general floor under tort claims, it is doubtful that the suggested limitations should be imposed *exclusively* on prisoners; the restrictions, if any, should be general. To classify prisoners separately with respect to procedures for securing specified categories of statutory and constitutional rights is a slippery slope. Judge Coffey in his concurring opinion cites a number of areas other than tort claims where prisoners have filed frivolous claims and I assume his "screening" process could extend broadly across the area of prisoner complaints. Again what Judge Coffey suggests seems to me to be another halfway house on the road to cutting off normal routes of access by prisoners to the courts. Only a few years ago it was a matter of some pride in our federal justice system that it was open to prisoners with personal or property grievances as much as, for example, to insurance companies with interpleaders or large manufacturers beseiged with product complaints.[1]

I am certainly as aware as anyone of the problems created by frivolous litigation—including the broad category of such cases emanating from prisons. But we do have

1. Prisoner claims are hardly the only area where there are good arguments for some limitation of the federal courts' jurisdiction. Diversity of citizenship cases, for example, account for almost twice as many new filings in the district courts as prisoner petitions. Between June 30, 1986 and June 30, 1987, 67,071 new diversity cases were filed in the district court, compared with 37,316 prisoner suits. Of the diversity cases, there were 32,840 private contract actions (including 6,685 insurance claims); 27,769 personal injury suits (12,485 of which were products liability actions, 6,686 of these asbestos cases); 4,072 real property actions (including 3,001 foreclosure suits); and 2,329 personal property damage claims. Between September 30, 1987 and the same date in 1988 a similar relationship exists: 69,062 diversity filings as compared with 39,732 prisoner petitions. The diversity filings for that year break down as follows: 32,236 contract claims (including 6,962 insurance actions); 30,342 personal injury suits (14,697 products liability cases, 9,824 of the latter asbestos-related); 4,007 real property actions (2,971 foreclosures); and 2,394 personal property damage claims. By reciting these statistics I do not intend to transform the present appeal into a legislative hearing, nor do I intend to minimize the burden federal courts face due to the large number of prisoner petitions being filed. I merely want to suggest that in any reordering of priorities involving the jurisdiction of the federal courts, Congress must take note that it is not only the prisoner who is contributing to the caseload. In addition, it is important that prisoner claims raise issues of federal law which are particularly appropriate for disposition by federal courts. This is not true of diversity litigation (although I think there are other cogent reasons for not taking a meat-axe approach to this jurisdiction).

 As Judge Coffey notes, Congress has recently increased the amount in controversy required to support federal diversity jurisdiction, in an effort to curtail the number of diversity cases filed. However, despite Judge Coffey's contrary view, the suggestion of the majority in the present case *is* in a crucial respect different from the approach Congress took in the Judicial Improvements and Access to Justice Act. Congress did not seek to target a specific group of litigants (such as tort plaintiffs, or mortgage and finance companies) *to bear the brunt of its* "streamlining" effort. Instead, Congress adopted a "status-neutral" approach to the problem. In the present case, by contrast, the majority seeks to exclude a particular class of litigants from federal court specifically because of their disfavored status as state and federal prisoners. It is this aspect of the majority's proposal which I find disquieting.

ways of coping with the problem which do not discriminate against prisoners. As Judge Coffey himself notes by quoting from *Neitzke v. Williams*, —— U.S. ——, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989), 28 U.S.C. section 1915 (which is, after all, the statute directly involved in this motion to proceed *in forma pauperis*) itself provides a powerful weapon to the federal courts to dismiss cases which are clearly frivolous. Dismissals under section 1915(d) can be made sua sponte, without the necessity of extended proceedings, and in fact without even requiring the defendant to appear and defend the action. Moreover, if Mr. Free really intends to abuse the process with a multitude of law suits, he may simply be enjoined from filing more suits without special permission as have been many others both inside and outside prisons. *See, e.g., In re Tyler*, 839 F.2d 1290 (8th Cir. 1988); *Lysiak v. Commissioner*, 816 F.2d 311 (7th Cir.1987) (per curiam); *Procup v. Strickland*, 792 F.2d 1069 (11th Cir.1986) (en banc); *Safir v. United States Lines, Inc.*, 792 F.2d 19, 23–25 (2d Cir.1986).

Finally, prisoners' property claims, though tenuous and of slight apparent significance to those of us outside the walls, no doubt loom larger in the context of a lifetime at Marion. Today, while interest in prisoners apparently continues its steady decline, we should be vigilant not to engage in wholesale or indiscriminate disparagement of their grievances.

COFFEY, Circuit Judge, concurring in the opinion and the judgment.

I fully agree with the well-reasoned analysis presented in the majority opinion. I write separately to emphasize the propriety of the majority's suggestion that Congress give consideration to creating an exclusive administrative remedy for federal inmates' small tort claims such as the one involved in this case. Further, I write to express my disagreement with Judge Cudahy's concurrence, which states that "it is doubtful that the suggested limitations should be imposed exclusively on prisoners.... To classify prisoners separately with respect to procedures for securing specified categories of statutory and constitutional rights is a slippery slope."

As an initial matter, it seems obvious that the suggestion of the majority and my concurrence is necessarily targeted at those confined in penal institutions because this is a prisoner case. It would be inappropriate for the majority to suggest that Congress consider creating exclusive administrative remedies in areas of the law other than the problem facing the court in this particular factual situation. Further, prisoner litigation is probably the area with the largest increase in case filings in the federal judiciary. In 1987, the federal circuit courts of appeals received 8,852 prisoner complaints, 683 of which were filed in this court. In 1988, the nationwide figures rose to 9,409 inmate complaints, 779 of which were in this circuit and with the numerous challenges we can expect under the Federal Sentencing Guidelines, the number of prisoner complaints will increase at a greater degree in the future. Because of the tremendous influx of prisoner cases in the federal courts recently, it seems obvious that Congress should give serious consideration to controlling the influx through a redefining of our jurisdiction over these cases should they determine it to be feasible.

In support of his position that prisoner litigation is "hardly the only area where there are good arguments for some limitation of the federal courts' jurisdiction," Judge Cudahy discusses the plethora of cases filed in the federal system based on diversity of citizenship and then goes on to state that "Congress must take note that it is not only the prisoner who is contributing to the caseload." Surprisingly, Judge Cudahy's discussion fails to note that Congress recently considered the problem of the increasing number of diversity cases filed in the federal courts and amended 28 U.S.C. § 1332 to increase the amount in controversy required for diversity of citizenship cases from $10,000 to $50,000. *See* Judicial Improvements and Access to Justice Act, Pub.L. No. 100–702, Title II, § 201, 102 Stat. 4642, 4646 (1988). Indeed, Congress justified its effort to further limit federal diversity jurisdiction partly on the federal judiciary's increasing caseload and

the potential for reduction thereof through the increase in the threshold jurisdictional amount, predicting that "[t]he increase in the amount in controversy to $50,000 should reduce the Federal diversity caseload by up to 40%." H.R.Rep. No. 889, 100th Cong., 2d Sess. 45 (1988) U.S.Code Cong. & Admin.News 1988, pp. 5982, 6005. It is apparent that Congress recognized the problem of the ever increasing caseload of the federal courts and took measures strikingly similar to the suggestion proposed in the majority opinion (i.e., restricting federal courts' jurisdiction over relatively "small" claims in an area where the number of claims is increasing) toward alleviating the problem. The suggestion the majority proposes is no different. That is, the majority informs Congress of an area of litigation where the number of cases filed continues to increase at an alarming rate and suggests that they consider some type of administrative remedy for prisoners' small, often frivolous claims, to diminish the profusion of such litigation in the federal courts.

In the eyes of federal litigants, the problem of the increasing number of prisoner complaints filed in the federal system is further exacerbated by the fact that the vast majority of prisoners are indigent, necessitating the filing of their complaints *in forma pauperis* and shifting the cost of litigating their claims to the public. Thus, the public is doubly affected by the increase in prisoner litigation. In addition to being forced to wait an inordinate amount of time for the courts to hear their cases, the same law-abiding citizens also bear the burden of underwriting the very costs associated with the filing and processing of prisoner small tort complaints, often alleging constitutional violations of dubious merit. The United States Supreme Court, in *Neitzke v. Williams,* — U.S. —, —, 109 S.Ct. 1827, 1831, 104 L.Ed.2d 338 (1989), stated the purpose of allowing indigent litigants to proceed *in forma pauperis:*

> "The federal *in forma pauperis* statute, enacted in 1892 and presently codified as 28 U.S.C. § 1915, is designed to ensure

that indigent litigants have meaningful access to the federal courts. *Adkins v. E.I. DuPont de Nemours & Co.,* 335 U.S. 331, 342–343, 69 S.Ct. 85, 90–91, 93 L.Ed. 43 (1948). Toward this end, § 1915(a) allows a litigant to commence a civil or criminal action in federal court *in forma pauperis* by filing in good faith an affidavit stating, *inter alia,* that he is unable to pay the costs of the lawsuit. Congress recognized, however, that a litigant whose filing fees and court costs are assumed by the public, unlike a paying litigant, lacks an economic incentive to refrain from filing frivolous, malicious, or repetitive lawsuits. To prevent such abusive or captious litigation, § 1915(d) authorizes federal courts to dismiss a claim filed *in forma pauperis* 'if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious.' Dismissals on these grounds are often made *sua sponte* prior to the issuance of process, so as to spare prospective defendants the inconvenience and expense of answering such complaints."

Despite the provision of § 1915, which was "designed largley to discourage the filing of, and waste of judicial and private resources upon, baseless lawsuits that paying litigants generally do not initiate," *Neitzke,* — U.S. at —, 109 S.Ct. at 1832–33, the federal judiciary continues to be inundated with frivolous complaints from federal prisoners. As Chief Justice Rehnquist stated in his dissent to *Cruz v. Beto:* "The inmate stands to gain something and lose nothing.... Though he may be denied legal relief, he will nonetheless have obtained a short sabbatical in the nearest federal courthouse." 405 U.S. 319, 327, 92 S.Ct. 1079, 1084, 31 L.Ed.2d 263 (1972) (Rehnquist, J., dissenting). While there is no dispute that prison inmates are entitled to relief in a court of law for true violations of their constitutional rights, I do believe it is becoming more evident every day that the efficient administration of justice is not served with the filing of highly questionable complaints alleging constitutional violations intermingled with the loss of various articles of

clothing (e.g., sweatshirts, tennis shoes and shoelaces) or personal effects (e.g., toothpaste, combs and baby powder), prison meals in which the main course is pork, sleep allegedly disrupted due to the sound of a train whistle at 2:30 a.m., and United States Marshals who refused to assist in carrying a prisoner's box of legal documents onto an airplane, to name only a few of the frivolous cases recently addressed by this court. Indeed, the Supreme Court has recognized this "surfeit of meritless *in forma pauperis* complaints" as an impediment to efficient judicial administration. *Neitzke,* —— U.S. at ——, 109 S.Ct. at 1832.

Given the tremendous increase in prisoner cases in the federal courts and the projected increase in prisoner population, as well as the vast amount of court time directed toward the imposition of these appeals that could be used to address other, more substantial controversies, singling out prisoners' unmeritorious small tort claims for relegation to an administrative remedy is clearly a logical step toward reducing the caseload of the federal judiciary, Judge Cudahy's doubts notwithstanding. These cases are "typically brought for their nuisance value by persons on whose hands time hangs heavy," *Savage v. CIA,* 826 F.2d 561, 563–64 (7th Cir.1987), and who having nothing else constructive to occupy their unproductive hours.

In expressing my agreement with the majority's suggestion that Congress consider creating an administrative remedy to consider the merits of these claims, I emphasize that the majority does not advocate "cutting off all normal routes of access by prisoners to the courts," as Judge Cudahy characterizes the majority's recommendation; rather, we suggest only a screening process to weed out unmeritorious claims, possibly similar to those hearings conducted by a hearing examiner or an administrative law judge.[1] Indeed, there is no dispute that all people—prisoners, as well as "those of us outside the walls"—*with meritorious claims* are entitled to an opportunity to be heard in a timely fashion in the federal court system. We suggest only that instead of further burdening our judicial manpower and resources with these matters, and thus delaying justice to those filing meritorious claims, an administrative hearing, conducted by one expertly trained and schooled in the area of prison administration and prisoners' rights, would be a far more efficient method of addressing this problem. As the majority aptly states, "The issue is the optimal remedy." *Ante* at 3. Congress might provide for this type of hearing on a trial basis, to afford the courts and Congress an opportunity to determine if this method of addressing prisoner complaints is feasible. I am confident that if the majority's suggestion is considered, and possibly accepted, it will be a step forward in alleviating the overburdened federal court system. Thus, I support without hesitation the majority's recommendation that "Congress ... give serious consideration to creating an exclusive rather than merely a preliminary administrative remedy for small tort claims by federal prisoners." *Id.*

---

1. Hearings similar to those recommended herein are conducted by Administrative Law Judges within the Social Security Administration, the Securities Exchange Commission, and the National Labor Relations Board, to name a few.

