64 F.3d 951
 Ghulam Mohammed NASIM, Plaintiff-Appellant,
and
Ghulam Ahmed Nasim; Abdul Karim Nasim, Plaintiffs,
v.
WARDEN, MARYLAND HOUSE OF CORRECTION; Asbestos Contractor,
Maryland House of Correction; Unknown Prison Officials,
Maryland House of Correction, All Individually and in their
Official Capacity Under Color of State Law, Defendants-Appellees.
 No. 93-7263.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 6, 1995.
Decided Sept. 15, 1995.
 
 ARGUED: Steven H. Goldblatt, Appellate Litigation Clinical Program, Georgetown University Law Center, Washington, DC, for appellant. Carmen Mercedes Shepard, Office of the Attorney General of Maryland, Baltimore, MD, for appellees. ON BRIEF: John J. Hoeffner, Supervising Attorney, Paul S. Ellis, Student Counsel, Appellate Litigation Clinical Program, Georgetown University Law Center, Washington, DC, for appellant. J. Joseph Curran, Jr., Attorney General of Maryland, Regina Hollins Lewis, Assistant Attorney General, Baltimore, MD, for appellees.
 Before ERVIN, Chief Judge, and RUSSELL, WIDENER, HALL, MURNAGHAN, WILKINSON, WILKINS, NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.
 Affirmed by published opinion. Judge NIEMEYER wrote the opinion for the court, in which Judges RUSSELL, WIDENER, HALL, WILKINSON, WILKINS, HAMILTON, LUTTIG, and WILLIAMS joined. Judge WILKINSON wrote a concurring opinion, in which Judges RUSSELL, WIDENER, WILKINS, HAMILTON, and WILLIAMS joined. Judge MOTZ wrote a dissenting opinion, in which Chief Judge ERVIN and Judges MURNAGHAN and MICHAEL joined.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 Section 1915(a) of Title 28 of the United States Code authorizes a district court to accept for filing, without the payment of costs, lawsuits brought by persons unable to pay such costs, and § 1915(d) authorizes the court to dismiss the suit before it is served "if satisfied that the action is frivolous or malicious." In this case we examine the appropriate standard for the district court to apply when screening these in forma pauperis cases and the standard for our review of the district court's decisions.
 
 
 2
 * Ghulam M. Nasim, proceeding pro se and in forma pauperis under 28 U.S.C. § 1915, filed suit in the district court under 42 U.S.C. § 1983 against the Warden of the Maryland House of Correction in Jessup, Maryland, and others allegedly involved in removing asbestos at the House of Correction for Eighth Amendment violations. Nasim alleges that the defendants deliberately exposed him to asbestos when asbestos removal contractors "dumped" asbestos into his prison cell while he was incarcerated during the period from April 1983 to November 1989 and that, as a result, he sustained a relapse from stroke, lung disease, eye disease, skin lesions, and psychological harm. Almost four years after he had been transferred from the Maryland House of Correction to a federal prison, he filed the complaint in this case.
 
 
 3
 Reviewing the complaint before authorizing service of process, the district court concluded that Nasim was in fact indigent but decided to dismiss the action as frivolous under 28 U.S.C. § 1915(d), without requiring service on defendants. The court ruled that the complaint was time-barred on its face, as it revealed that Nasim knew or should have known of his injury and its cause at the time the asbestos was being removed in 1989. In particular, the district court referred to the second paragraph of Nasim's complaint where Nasim alleged:
 
 
 4
 Plaintiff and other inmate witnessed and observed on several occasions when Asbestos crew secretly entered into the F-Building during night hours and neither prison staff nor the contractor gave any protection, warning or respirator to the Plaintiff or any other inmate at the F-Building during this entire period [in 1989].
 
 
 5
 The court concluded that Nasim's action, filed in September 1993, almost four years after the alleged asbestos removal, was time-barred under the applicable three-year statute of limitations.
 
 
 6
 On motion for reconsideration based on newly discovered evidence, Nasim alleged that he did not know that the asbestos caused his injury until 1991 when he received information that he had requested under the Freedom of Information Act and read news articles in The Baltimore Sun about "hundreds of similar lawsuits filed in the Circuit Court for Baltimore City" which "substantiated that 'exposure to cancer-causing asbestos chemicals had enhanced plaintiff's relapse from stroke on February 6, 1989' in addition to lung, skin, eye and ear disease...." The district court denied the motion for reconsideration, concluding that the facts advanced by Nasim did not relieve him of the "burden of timely filing his action."
 
 
 7
 On appeal, a panel of this court, in a divided opinion, reversed the judgment of the district court, applying a standard of review which "requires appellate courts to examine carefully both the complaint and the legal principles governing the limitations defense." Nasim v. Warden, 42 F.3d 1472, 1477 (4th Cir.1995). The panel opinion concluded that:
 
 
 8
 A general awareness that asbestos poses certain unidentified health risks, as evidenced here by Nasim's complaints to prison officials, does not warrant the conclusion, at least at this preliminary stage, that Nasim possessed sufficient information that he knew, or should have known, ... that the asbestos was the probable cause of his health problems....
 
 
 9
 Id. at 1480 (internal citations and quotations omitted). In ordering a rehearing en banc, we vacated the panel decision, and now we affirm the judgment of the district court.
 
 II
 
 10
 The federal in forma pauperis statute, first enacted in 1892, is intended to guarantee that no citizen shall be denied access to the courts "solely because his poverty makes it impossible for him to pay or secure the costs." Adkins v. E.I. DuPont de Nemours & Co., 335 U.S. 331, 342, 69 S.Ct. 85, 90, 93 L.Ed. 43 (1948). The statute advances a policy of equality of access, ensuring that those who cannot afford the payment of costs have the same ability to present meritorious claims as those who can afford such payment.
 
 
 11
 Congress recognized that when it eliminated the requirement for paying costs for the purpose of ensuring "equal treatment for every litigant before the bar," see Coppedge v. United States, 369 U.S. 438, 447, 82 S.Ct. 917, 922, 8 L.Ed.2d 21 (1962), it was also removing any "economic incentive to refrain from filing frivolous, malicious, or repetitive lawsuits." Neitzke v. Williams, 490 U.S. 319, 324, 109 S.Ct. 1827, 1831, 104 L.Ed.2d 338 (1989). In an effort to prevent the abuse of litigation that free access to the courts might encourage, the statute confers discretion on the district court to dismiss an action as frivolous if the court is "satisfied" that the action lacks an arguable basis either in law or in fact. See 28 U.S.C. § 1915(d); Neitzke, 490 U.S. at 325, 109 S.Ct. at 1831-32. As the Court in Neitzke explained:
 
 
 12
 Section 1915(d) is designed largely to discourage the filing of, and waste of judicial and private resources upon, baseless lawsuits that paying litigants generally do not initiate because of the costs of bringing suit and because of the threat of sanctions for bringing vexatious suits under Federal Rule of Civil Procedure 11.
 
 
 13
 Id. at 327, 109 S.Ct. at 1833. Thus, the discretion granted to district judges to screen out meritless cases serves as the surrogate for the constraint which financial considerations provide "in the realm of paid cases." Neitzke, 490 U.S. at 328, 109 S.Ct. at 1833.
 
 
 14
 If meritless suits were not linked to some measure of accountability, the free access to the courts, coupled with an intent to misuse the system,[1] would predictably clog the judicial system to such an extent that "meritorious complaints [would] receive inadequate attention or be difficult to identify amidst the overwhelming number of meritless complaints." Neitzke, 490 U.S. at 326, 109 S.Ct. at 1832 (emphasis added). That concern is not insubstantial. Data from the Fourth Circuit, for example, show that during the last three years, the percentage of in forma pauperis filings on appeal has increased from about one-third to one-half of all filings, and the raw numbers have increased from 1,331 in fiscal year 1992 to 2,133 for the first ten months of fiscal year 1995 (2,560 annualized).[2]
 
 
 15
 Section 1915(d) in effect appoints the district court as the gatekeeper of in forma pauperis filings, armed with meaningful discretion to exclude those cases which it is satisfied are frivolous. The district court's role is defined in Neitzke:
 
 
 16
 [T]he statute accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.
 
 
 17
 490 U.S. at 327, 109 S.Ct. at 1833. The authority to "pierce the veil of the complaint's factual allegations" means that the district court is not bound to "accept without question the truth of the plaintiff's allegations" as it might be when considering a motion under Rule 12(b)(6). Denton v. Hernandez, 504 U.S. 25, 32, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1992). While that authority does not authorize the district court to engage in factfinding to resolve disputed facts, it does permit the court to apply common sense, reject the fantastic, and rebut alleged matters with judicially noticeable facts. Id. at 32-33, 112 S.Ct. at 1733-34.
 
 
 18
 Thus, to provide free access to the courts without overwhelming the efficient administration of justice with meritless cases, the system relies primarily on the judgment of the district courts to permit suits that are arguably meritorious and to exclude suits that have no arguable basis in law or fact.[3]
 
 
 19
 In deference to the discretion that Congress has conferred on the district courts, we review a district court's decision to dismiss a case under § 1915(d) only for abuse of that discretion. See Denton, 504 U.S. at 33, 112 S.Ct. at 1733-34. See also Adams v. Rice, 40 F.3d 72, 74 (4th Cir.1994) (noting that Congress' use of the word "satisfied" indicates an intent to afford a district court's decision to dismiss under § 1915(d) "wide latitude" and "substantial deference"), cert. denied, --- U.S. ----, 115 S.Ct. 1371, 131 L.Ed.2d 227 (1995). This deferential standard of review is, in large measure, intended to keep the screening process in the district courts, which are in the best position to ascertain facts that are "clearly baseless," Denton, 504 U.S. at 33, 112 S.Ct. at 1734, and to limit appellate oversight to only those circumstances where the district court's discretion has been abused.
 
 
 20
 Applying these principles, we turn to the district court's decision in this case.
 
 III
 
 21
 The district court concluded in this case that Nasim's complaint was baseless because, on its face, the complaint demonstrates that it was not timely filed, as it was not filed within three years after the claims accrued. See Todd v. Baskerville, 712 F.2d 70, 74 (4th Cir.1983) (affirming district court's dismissal under § 1915(d) of actions which appeared on their face to be barred by statute of limitations). The district court noted that the statute of limitations for a claim under 42 U.S.C. § 1983 is borrowed from state law, see Wilson v. Garcia, 471 U.S. 261, 266-69, 105 S.Ct. 1938, 1942-43, 85 L.Ed.2d 254 (1985), and that Maryland applies its general three-year statute of limitations to similar tort actions. But the court correctly observed that even though the limitation period is borrowed from state law, the question of when a cause of action accrues under 42 U.S.C. § 1983 remains one of federal law. See Cox v. Stanton, 529 F.2d 47, 50 (4th Cir.1975).
 
 
 22
 Under federal law a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action. See United States v. Kubrick, 444 U.S. 111, 122-24, 100 S.Ct. 352, 359-60, 62 L.Ed.2d 259 (1979). In Kubrick, the Court held that for a cause of action to accrue, it is critical that the plaintiff know that he has been hurt and who inflicted the injury. Once imputed with that knowledge, the plaintiff is on inquiry notice, imposing on him a duty to inquire about the details of negligence that are reasonably discoverable. "To excuse him from promptly [making inquiry] by postponing the accrual of his claim would undermine the purpose of the limitations statute." Id. at 123, 100 S.Ct. at 360.
 
 
 23
 In Kubrick, a VA hospital administered the antibiotic neomycin to Kubrick in connection with the treatment of an infection. Six weeks later Kubrick began to experience a loss of hearing, and shortly thereafter he was advised by doctors that it was highly possible that his loss of hearing was the result of the neomycin treatment. However, Kubrick did not know that the use of neomycin could be considered an improper treatment. More than two years later, after the applicable statute of limitations had run, Kubrick learned that the administration of neomycin may have constituted medical malpractice. In holding that Kubrick's claim was time-barred, the Supreme Court noted that when the plaintiff knew that he was hurt and knew who inflicted his injury, he was obliged to inquire further about the potential for a negligence claim. Accrual of a claim does not "await awareness by the plaintiff that his injury was negligently inflicted." 444 U.S. at 123, 100 S.Ct. at 360. See also Childers Oil Co. v. Exxon Corp., 960 F.2d 1265, 1272 (4th Cir.1992). Thus, for purposes of a § 1983 claim, a cause of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice--e.g., by the knowledge of the fact of injury and who caused it--to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim.
 
 
 24
 To the extent that our earlier decision in Portis v. United States, 483 F.2d 670 (4th Cir.1973), may stand for a standard contrary to that adopted in Kubrick, it was overruled by Kubrick, and it is now well established that a federal cause of action accrues upon inquiry notice. See also Gould v. United States Dep't of Health & Human Servs., 905 F.2d 738, 742 (4th Cir.1990) (en banc), cert. denied, 498 U.S. 1025, 111 S.Ct. 673, 112 L.Ed.2d 666 (1991); Blanck v. McKeen, 707 F.2d 817, 819-20 (4th Cir.), cert. denied, 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983).
 
 
 25
 Turning to Nasim's complaint, we conclude that the allegations therein fully support the district court's judgment. But more importantly, we cannot conclude that the district court abused its discretion in dismissing it.
 
 
 26
 In his complaint, Nasim alleges that during his incarceration at the Maryland House of Correction from April 1983 to November 1989 he "suffered several attacks of relapse from stroke, lung disease, eye disease, and skin lesion from asbestos exposure." He complains that in 1989 asbestos was falling into his prison cell, an observation which he reported to doctors, nurses, the warden, and the acting commissioner of corrections. He alleges that he discovered from a prison official and another inmate that the warden had authorized an asbestos contractor to clean up the asbestos in the prison while inmates were "asleep and locked into their cages." He states that neither prison officials nor the contractor attempted to warn or protect him, despite their recognition at the time that "desk officers claimed severe hea[l]th hazard[s] from asbestos inhalation and subsequently quit from the employment mainly [because] the warden refused to provide respirator[s] for their protection." He alleges that the contractor was later fired because it negligently scraped asbestos, failed to adopt adequate protective measures, and failed to warn prison officials. Nasim also alleges that no notice or warning was provided "to [him] nor to any other inmates who died or suffered severe respiratory or other medical problems during this illegal and malicious act of the defendants." Nasim claims that he suffered not only physical but psychological injuries as a result of the asbestos removal, and demands several million dollars in compensatory and punitive damages.
 
 
 27
 The complaint thus reveals that during the 1989 period (1) Nasim knew that asbestos was "dumped" into his prison cell and that he was exposed to it; (2) he knew who "dumped" the asbestos into his cell; (3) he knew that asbestos presented a health hazard; (4) he complained to nurses, doctors, and prison authorities about the exposure; (5) he witnessed other persons who he believed were seriously injured by asbestos; and (6) he suffered physical and psychological injuries. The record also shows that Nasim is a doctor who practiced medicine and surgery in the United States and England for several years before his conviction.
 
 
 28
 While Nasim may yet be able to assert that he did not know specifically that asbestos was linked to strokes, eye disease, or skin disease (assuming such a linkage may be plausibly maintained), the indisputable facts remain that Nasim knew of his injury and who caused it, and that he believed that they were linked, as he implies in alleging that he sustained psychological harm. Moreover, the fact that Nasim alleges that he complained to medical and prison personnel in 1989 reveals sufficient knowledge for finding that his claim accrued while he was still at the Maryland House of Correction. Notwithstanding his awareness of his asbestos exposure and of the nature of his injuries, Nasim waited until after he read about asbestos lawsuits in the Baltimore newspapers before he filed his complaint--some four years after he had been transferred from the Maryland House of Correction.
 
 
 29
 Thus, there can be little doubt that Nasim not only knew that he had been exposed to asbestos, that he had been injured, and who "dumped" the asbestos in his cell, he also knew that asbestos was dangerous and that others at the prison had been injured by it. The district court thus concluded from the face of his complaint that Nasim possessed sufficient knowledge of his cause of action in 1989 to place him on inquiry notice. And since Nasim filed his complaint four years later, the court found that it was barred by the applicable three-year statute of limitations. In these circumstances, the district court did not abuse its discretion in concluding that the action was frivolous under 28 U.S.C. § 1915(d).
 
 
 30
 Accordingly, the judgment of the district court is
 
 
 31
 AFFIRMED.
 
 WILKINSON, Circuit Judge, concurring:
 
 32
 I am happy to concur in Judge Niemeyer's fine opinion. This expression of the en banc court should encourage the more vigorous use of § 1915(d) and make reversals of such dismissals rare events. At the same time, no one should be under the illusion that 28 U.S.C. § 1915(d) provides the answer to the swelling tide of state prisoner litigation in federal court.[1] Absent Congressional action, this problem will only worsen.
 
 I.
 
 33
 The in forma pauperis statute was originally enacted in 1892. See Act of July 20, 1892, ch. 209, 27 Stat. 252 (codified as amended at 28 U.S.C. § 1915). It is a study in the resolution of competing interests. In § 1915(a), Congress sought to ensure that personal wealth would not determine access to the federal courts. In § 1915(d), however, Congress simultaneously sought to prevent abuse of the privilege of cost-free-access. Subsections (a) and (d) necessarily inform the meaning of each other. Remarkably, the operative language of what is now § 1915(d) is substantially the same as it was in 1892. Compare ch. 209, § 4, 27 Stat. 252 ("[T]he court ... may dismiss any such cause so brought under this act ... if said court be satisfied that the alleged cause of action is frivolous or malicious.") with 28 U.S.C. § 1915(d) ("The court ... may dismiss the case ... if satisfied that the action is frivolous or malicious.").
 
 
 34
 More than a century later, we have strayed far from the balanced scheme set forth in the in forma pauperis statute. The intended purpose of § 1915(d)--to counterbalance § 1915(a) by preventing abuse of the judicial system--is not being achieved in modern practice. Developments in the law since 1892 and the attendant rise in prisoner petitions have undermined the efficacy of § 1915(d).
 
 
 35
 The root of the problem is that the in forma pauperis statute was passed long before the emergence of § 1983 as the broad-based cause of action that it is today. Beginning in the 1960s, a plethora of new constitutional rights were created which, coupled with a reinvigorated § 1983, see Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), produced an upsurge in constitutional litigation. Whereas suits under § 1983 accounted for 1% of all civil cases filed in the district courts in 1967, they grew to constitute 14% of that docket in 1993. In raw numbers, this translates into an increase in complaints from 878 to more than 33,000. Robert G. Doumar, "Prisoner Cases: Feeding the Monster in the Judicial Closet," 14 St. Louis U. Pub.L.Rev. 21, 23 (1994) (Table 1) (citing Admin. Off. of the U.S. Courts, Ann. Reps. of the Director).[2] The statistics generated by this unnecessary avalanche of filings have been periodically used to make the case to Congress for further federal judicial growth.
 
 
 36
 State prisoners have also become the classic § 1983 plaintiffs. This is not surprising, as such prisoners are subject to constant state control and have a surplus of free time. See Savage v. CIA, 826 F.2d 561, 563-64 (7th Cir.1987). To complicate matters further, our contemporary legal system invites prisoners to sue. Any rational prisoner will bring more rather than fewer suits, regardless of the legal merit of the claims. As Chief Justice Rehnquist put it, "The inmate stands to gain something and lose nothing from a complaint stating facts that he is ultimately unable to prove." Cruz v. Beto, 405 U.S. 319, 326-27, 92 S.Ct. 1079, 1084, 31 L.Ed.2d 263 (1972) (Rehnquist, J., dissenting). Whether the incentive to sue is a "sabbatical in the nearest federal courthouse," id., the harassment of prison officials, or the prospect of monetary recovery, there is little downside for the plaintiff.
 
 
 37
 It should come as no surprise that § 1915(d) has been largely ineffective in handling the flood of prisoner complaints that inundates the federal courts. Indeed, in the Norfolk Division of the Eastern District of Virginia, § 1915(d) dismissals accounted last year for only 4.8% of dismissals of prisoner civil rights filings. Doumar, supra, at 29 n. 32. And even when a claim is dismissed under § 1915(d), that dismissal is appealable as a matter of right, which expends further public resources.
 
 
 38
 In sum, developments in the judicial interpretation of § 1983 and the Constitution have fueled an explosion in prisoner litigation. Yet while the realities of in forma pauperis litigation are vastly different from what they were in 1892, § 1915(d) has remained essentially unchanged. Thus, district judges are equipped with a nineteenth-century tool to handle a late twentieth-century phenomenon.
 
 II.
 
 39
 Prisoner petitions pose serious problems for the federal courts. First, the sheer number of prisoner complaints, most of which are meritless, imposes tremendous costs on the judicial system. The Supreme Court has lamented that these petitions often result in the "squandering of judicial resources with little offsetting benefit to anyone." Sandin v. Conner, --- U.S. ----, ----, 115 S.Ct. 2293, 2299, 132 L.Ed.2d 418 (1995). In the context of a prisoner's in forma pauperis suit under the Freedom of Information Act, the Seventh Circuit described those resource costs as follows:
 
 
 40
 We cannot forbear to express concern about the waste of judicial resources that is involved in allowing a person to obtain two levels of federal judicial review of an agency's denial of a claim for $39.20. Of course, every person--even the humblest--even a prison inmate--should have a remedy of some kind against the arbitrary denial of his legal rights. But surely there is a better way--having due regard for the rise in federal judicial caseloads, the limited capacity of the federal judiciary, and the costs imposed on litigants whose equally weighty or weightier concerns are pushed farther back in the queue--to provide such a remedy in a [minor] case than by giving the claimant the full run of the Article III courts.
 
 
 41
 Savage, 826 F.2d at 563.
 
 
 42
 Second, the great number of prisoner petitions has forced federal courts to resort to adjudicative systems in which decisions are handed down with only the tangential involvement of Article III judges. The use of staff counsel and other alternative modes of judicial decisionmaking has been increased for the specific purpose of handling these claims. Doumar, supra, at 27-29. Whenever claims are disposed of without the closest attention of the judges, the legitimacy of the federal courts is at risk. Furthermore, where Article III judges are directly involved, the predominance of these cases threatens to convert the job of judging, particularly at the trial level, into a subspecialty of prison litigation. This will diminish the attractiveness of the federal bench for many candidates.
 
 
 43
 Finally, excessive prison litigation under § 1983 results in undue federal interference with the daily administration of state prisons. Federal judicial micromanagement of state prisons is, among other things, a recipe for poor administrative results. Federal litigation also undermines the maintenance of state prison discipline by perpetually placing authority on the defensive. Accordingly, we have recognized that "absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities." Taylor v. Freeman, 34 F.3d 266, 268 (4th Cir.1994). Notwithstanding this salutary admonition, the federal judiciary is asked day after day to monitor the minutiae of state prison life. Every aspect of prison administration--from food to disciplinary measures, housing and custody arrangements, medical care, prison transfers, parole eligibility, and the handling of mail and personal belongings--is brought into question. The processes of litigation occasion interference and disruption, even where the merits of an action are resolved against the claimant. This is to the lasting detriment of the federal-state balance. "It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." Preiser v. Rodriguez, 411 U.S. 475, 491-92, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973). It is, ironically, equally difficult to imagine a field in which the federal judiciary has become more completely immersed.
 
 III.
 
 44
 Although district courts may not exceed their statutory authority and dismiss nonfrivolous suits under § 1915(d), they should not hesitate to employ § 1915(d) to effectuate Congressional intent. The provision gives district judges great latitude in determining the question of frivolity. Adams v. Rice, 40 F.3d 72, 74 (4th Cir.1994). Reviewing courts can best serve the statutory purpose by according substantial deference to a district court's decision to dismiss. See Denton v. Hernandez, 504 U.S. 25, 33-34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992).
 
 
 45
 In addition, courts may devise filing fee requirements pursuant to their local rules. In the Eastern District of Virginia, for instance, prisoners who wish to proceed in forma pauperis must pay a partial fee based on their bank account deposits over the preceding six months. See Doumar, supra, at 31 (explaining that this rule "forces prisoners to determine whether their complaint is worth the cost of proceeding with their suit"). In extreme cases of abuse of the judicial process, courts have enjoined prisoners from filing suits without permission. See e.g., In re Tyler, 839 F.2d 1290 (8th Cir.1988). Finally, courts must take cognizance of 42 U.S.C. § 1997e, which permits them to require exhaustion of administrative remedies for prisoner claims under § 1983, so long as the state's grievance procedure meets minimum standards of fairness.
 
 
 46
 These tools have long been available yet they have failed to stanch the flow of prisoner petitions. Courts are, after all, judicial bodies, and the steps judges take in coping with a systemic problem such as this are properly limited to the margins. It is Congress that must undertake the basic reforms that are necessary. See e.g., Free v. United States, 879 F.2d 1535, 1536 (7th Cir.1989) (suggesting that Congress create "an exclusive rather than merely a preliminary administrative remedy for small tort claims by federal prisoners"); Doumar, supra, at 38 (suggesting that Congress route suits by state prisoners exclusively to state court). The federal nature of a claim does not always require a federal court to resolve it. State bodies should be the ones to hear complaints about state prison management. The experiment in federal oversight has outlived its usefulness.
 
 
 47
 Judges DONALD RUSSELL, WIDENER, WILKINS, HAMILTON, and WILLIAMS authorize me to say that they join in this concurring opinion.
 
 MOTZ, Circuit Judge, dissenting:
 
 48
 There is much in the majority and concurring opinions with which I agree. But with the majority's holding--that in this case it was clear from the face of the complaint that the statute of limitations had expired--I cannot agree and so must respectfully dissent.
 
 
 49
 A district court has discretion to dismiss an in forma pauperis complaint "if satisfied that the action is frivolous or malicious." 28 U.S.C. § 1915(d). Moreover, a meritorious affirmative defense can constitute the basis for a court's determination that an in forma pauperis action is frivolous or malicious. But a waivable affirmative defense that has not been raised by any party, like the limitations defense here, can provide the basis for dismissal only if the defense is clear from the face of the complaint. Thus, prior to receipt of any pleading raising the defense, a district court has no discretion to dismiss an in forma pauperis action on the basis of a waivable affirmative defense if that defense is not clear from the face of the complaint. This has long been the rule in this circuit, see Todd v. Baskerville, 712 F.2d 70, 74 (4th Cir.1983),[1] and is consistent with the wellestablished principle that an affirmative defense can provide the basis for dismissal under Fed.R.Civ.P. 12(b)(6) "only if [that defense] clearly appears on the face of the complaint." Richmond, Fredericksburg & Potomac R. Co. v. Forst, 4 F.3d 244, 250 (4th Cir.1993) (and authorities cited therein). The majority acknowledges these governing principles, citing Todd and accurately indicating that there we affirmed a "district court's dismissal under § 1915(d) of actions which appeared on their face to be barred by statute of limitations." Op. at 955.
 
 
 50
 Where the majority falters is in applying these principles to the facts of this case. The fundamental mistake the majority makes is reading into the complaint critical facts that simply are not there. Nasim alleges that by 1989 he had complained of various health problems and of the dumping of asbestos into his cell. What he does not allege are facts indicating that he knew, or had reason to know, that asbestos was the "probable cause" of his health problems. United States v. Kubrick, 444 U.S. 111, 118, 100 S.Ct. 352, 357, 62 L.Ed.2d 259 (1979). Indeed, Nasim alleges that he suffered numerous health problems continually from the early 1980s through 1989, and so it would have been entirely reasonable for him initially to fail to recognize asbestos as the probable cause of his 1989 health problems. This is particularly true in view of the fact that asbestos injuries are typically latent in nature, not manifesting themselves until several years after exposure. See Taurel v. Central Gulf Lines, Inc., 947 F.2d 769, 771 (5th Cir.1991).
 
 
 51
 Furthermore, in a verified motion for reconsideration, which Nasim filed shortly after his complaint was dismissed, he specifically disavowed any knowledge prior to October 1991 that asbestos caused his health problems. The majority relies on facts in this motion for reconsideration in concluding that the statute of limitations had expired. Op. at 956.[2] Yet, it gives no credence to Nasim's express declarations in the motion that in 1989 he had "no knowledge whatsoever that asbestos chemicals caused cancer and cardio-vascular disease, like stroke or heart ailments," that instead "all the blame was laid on denial of medical treatment and conspiracy letter discovered from prison hospital files in 1987," and that it was not until 1991 when he received information pursuant to a Freedom of Information Act request and newspaper articles as to the "adverse effects of exposure to asbestos" that he had reason to know that "exposure to cancer-causing asbestos chemicals had enhanced plaintiff's relapse from stroke."
 
 
 52
 Of course, all of the assertions in Nasim's complaint and motion may ultimately prove to be false, but there is certainly nothing on the face of the complaint demonstrating this. In Denton v. Hernandez, 504 U.S. 25, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992), the Supreme Court cautioned:
 
 
 53
 An in forma pauperis complaint may not be dismissed ... simply because the court finds the plaintiff's allegations unlikely. Some improbable allegations might properly be disposed of on summary judgment, but to dismiss them as frivolous without any factual development is to disregard the age-old insight that many allegations might be "strange, but true; for truth is always strange, Stranger than fiction."
 
 
 54
 Id. at 33, 112 S.Ct. at 1733-34 (quoting Lord Byron, Don Juan, canto XIV, stanza 101 (T. Steffan, E. Steffan & W. Pratt eds., 1977)).
 
 
 55
 This warning is worth remembering when considering the concerns voiced in the majority and concurring opinions as to in forma pauperis prisoner filings. Not all such prisoner suits are frivolous or malicious. For example, prisoners have filed pro se complaints that succeeded in obtaining relief to ameliorate sub-standard prison conditions, see, e.g., Moore v. Morgan, 922 F.2d 1553 (11th Cir.1991), and to stem prisoner assaults and abuse, see, e.g., Ayala Serrano v. Lebron Gonzalez, 909 F.2d 8 (1st Cir.1990); Franklin v. Aycock, 795 F.2d 1253 (6th Cir.1986), problems that will only increase as the present prison population continues to grow.[3]
 
 
 56
 This is not to say that the recent increase in forma pauperis prisoner filings does not present increasingly difficult problems for the federal courts. The majority and concurring opinions, the authorities cited in them, the Federal Courts Study Committee, and various Judicial Conference committees have eloquently detailed these difficulties. These are real problems and it well may be, as some of my good colleagues suggest, that Congress should take steps to curtail in forma pauperis prisoner suits in federal courts.
 
 
 57
 But unless and until that is done, we cannot dismiss or affirm the dismissals of such suits merely because we do not like them or because most of them are frivolous. Rather, the Supreme Court has directed that federal courts are to construe all pro se complaints "liberally." Boag v. MacDougall, 454 U.S. 364, 365, 102 S.Ct. 700, 701, 70 L.Ed.2d 551 (1982) (per curiam) (reversing § 1915(d) dismissal); see also Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972) (per curiam). In the past, we have taken this mandate seriously. See, e.g., White v. White, 886 F.2d 721, 722-23 (4th Cir.1989) (pro se complaint "must" be held to "less stringent standards than pleadings drafted by attorneys and must [be] read ... liberally"); Boyce v. Alizaduh, 595 F.2d 948, 951 (4th Cir.1979) (authority to dismiss under § 1915(d) is "limited in a pro se case, such as here, by the rule ... that 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers and can only be dismissed ... if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief' " (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976))). I hope and trust we will follow this mandate in the future. Regrettably, the majority ignores it today.
 
 
 58
 Chief Judge ERVIN, Judge MURNAGHAN, and Judge MICHAEL have authorized me to indicate that they join in this dissenting opinion.
 
 
 
 [1]
 As we previously have observed about prisoner litigation, all too often such litigation has been initiated to provide a "mere outlet[ ] for general discontent" or "personal satisfaction in attempting to harass prison officials." Evans v. Croom, 650 F.2d 521 (4th Cir.1981), cert. denied, 454 U.S. 1153, 102 S.Ct. 1023, 71 L.Ed.2d 309 (1982). Prisoner litigation constitutes roughly 75% of the in forma pauperis cases filed in the Fourth Circuit
 
 
 [2]
 The data from the Fourth Circuit show:
 Fiscal year 1992 1993 1994 1995 (10 months)
In forma pauperis filings 1,331 1,584 1,702 2,133
Total filings 3,949 4,390 3,995 4,332
Ratio of in forma pauperis filings 33.7% 36.1% 42.6% 49.2%
 
 
 [3]
 That is not to say that some financial incentives could not be built into the system. For instance, we have approved local rules and orders that require an in forma pauperis plaintiff to pay a partial filing fee based on income received within a specified period preceding the filing of the in forma pauperis motion, but not to exceed 15% of the aggregate income received. See Evans v. Croom, 650 F.2d 521 (4th Cir.1981) (approving as reasonable an order in the Eastern District of North Carolina requiring partial filing fees for prisoners ranging from $1.00 to $33.00), cert. denied, 454 U.S. 1153, 102 S.Ct. 1023, 71 L.Ed.2d 309 (1982). Other district courts have adopted similar provisions in their local rules. See, e.g., E.D.Va.R. 28; D.S.C.R. 22.02. Whether provisions of this type have the desired effect of encouraging in forma pauperis litigants to file only meritorious claims cannot be determined from the public data available at the Fourth Circuit. Such provisions, however, may force in forma pauperis litigants to " 'confront the initial dilemma which faces most other potential civil litigants: is the merit of the claim worth the cost of pursuing it?' " Evans, 650 F.2d at 524 (quoting Braden v. Estelle, 428 F.Supp. 595, 596 (S.D.Tex.1977))
 
 
 [1]
 While there is no necessary correlation between in forma pauperis plaintiffs and prisoners, there is an actual one. See Free v. United States, 879 F.2d 1535, 1539 (7th Cir.1989) ("[T]he vast majority of prisoners are indigent, necessitating the filing of their complaints in forma pauperis ....") (Coffey, J., concurring)
 
 
 [2]
 To suggest, as our dissenting colleagues do, that the increase in filings is primarily a function of prison populations is to overlook this prolonged upward trend
 
 
 [1]
 It is also the rule in every other circuit to consider the question. See, e.g., Moore v. McDonald, 30 F.3d 616, 620 (5th Cir.1994); Slack v. Carpenter, 7 F.3d 418, 419-20 (5th Cir.1993); Niccolai v. U.S. Bureau of Prisons, 4 F.3d 691, 692-93 (8th Cir.1993); Gartrell v. Gaylor, 981 F.2d 254, 256 (5th Cir.1993); Johnson v. Rodriguez, 943 F.2d 104, 107-08 (1st Cir.1991), cert. denied, 502 U.S. 1063, 112 S.Ct. 948, 117 L.Ed.2d 117 (1992); Street v. Vose, 936 F.2d 38, 39 (1st Cir.1991), cert. denied, 502 U.S. 1063, 112 S.Ct. 948, 117 L.Ed.2d 117 (1992). As the Tenth Circuit recently noted in reversing a district court's sua sponte grant of § 1915 dismissal on the theory that limitations had expired, "[s]ection 1915(d) dismissal on the basis of an affirmative defense which the district court raises sua sponte is reserved for those extraordinary instances when the claim's factual backdrop clearly beckons the defense." Fratus v. Deland, 49 F.3d 673, 676 (10th Cir.1995); see also Clark v. Georgia Pardons & Paroles Bd., 915 F.2d 636, 640 (11th Cir.1990) (dicta). See generally Brownlee v. Conine, 957 F.2d 353 (7th Cir.1992) (Posner, J.). The panel that initially considered this case noted that in reviewing § 1915(d) dismissals in these circumstances, appellate courts must "examine carefully both the complaint and the legal principles governing the limitations defense." 42 F.3d at 1477. Although the majority seems to disapprove of this language, op. at 953, in the above cases other circuits have certainly engaged in precisely this examination. Moreover, the majority itself undertakes--albeit inadequately, in my view--such an examination
 
 
 [2]
 The majority asserts that the record "shows that Nasim is a doctor who practiced medicine and surgery in the United States and England for several years before his conviction." Op. at 956. There is absolutely no indication in the complaint that Nasim had any medical training, and so the district court could not possibly have relied on that fact when it dismissed the complaint. Nasim does make this assertion in his motion for reconsideration. But if this avowal of medical training is to be relied upon, as the majority does, in finding that the limitations had expired, then it is difficult to find any rationale for not also crediting Nasim's declarations in the motion that prior to 1991 he had "no knowledge that asbestos chemicals caused cancer." Furthermore, the assertion that Nasim had medical training is not at all inconsistent with his insistence that although he knew he was exposed to asbestos in 1989, he did not realize that it caused his health problems. As a doctor, Nasim could be expected to know that, as noted above, the ill affects of asbestos exposure are generally not apparent immediately, see Taurel, 947 F.2d at 771, and so Nasim would have had no reason to believe that health problems he suffered in 1988 and 1989 were the result of asbestos exposure in 1988 and 1989
 
 
 [3]
 The most obvious explanation for the recent increase in prisoner filings is not, as is suggested in the concurring opinion, the "reinvigoration" of § 1983 or even the creation in the 1960s of a "plethora of new constitutional rights," but the dramatic increase in both state and federal prison populations. So while we may lament the "unnecessary avalanche of such filings," we should not be altogether surprised by it. Of course, we should seek to minimize federal judicial micromanagement of state prisons, but presumably most judicial intervention results not from excessive prison litigation, but from those instances in which a meritorious claim requires it