**James Huston JONES, and all others similarly situated, Plaintiff–Appellant,**

v.

**GEORGIA STATE BOARD OF PARDONS AND PAROLES, et al., Defendants–Appellees.**

No. 92–9166.

United States Court of Appeals, Eleventh Circuit.

July 28, 1995.

**1146**

Donald F. Samuel, Atlanta, GA, for appellant.

William F. Amideo, State Law Dept., Atlanta, GA, for appellees.

Before KRAVITCH and CARNES, Circuit Judges, and HAND *, Senior District Judge.

* Honorable William B. Hand, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

KRAVITCH, Circuit Judge:

This is a class action, brought under 42 U.S.C. § 1983, on behalf of certain Georgia state prisoners classified as Level V offenders under the Georgia Parole Decision Guidelines System (the "Guidelines"). The class contends that a recent change in the method for calculating the Tentative Parole Month ("TPM") of Level V offenders under the Guidelines has been applied retroactively in violation of the Ex Post Facto Clause of the United States Constitution. The class also challenges this modification on substantive due process grounds, contending that class members were sentenced on the basis of inaccurate information because state trial judges were unaware of the impending change in parole rules. Concluding that the use of the new method did not result in any constitutional violations, the district court granted summary judgment in favor of the Georgia State Board of Pardons and Paroles (the "Board"). We DISMISS the appeal in part as moot, and AFFIRM in part.

## I.

The Board adopted the Guidelines in the late 1970's to promote consistency and rationality in its parole decisionmaking. *See Sultenfuss v. Snow*, 35 F.3d 1494, 1496–97 (11th Cir.1994) (en banc), *cert. denied*, —— U.S. ——, 115 S.Ct. 1254, 131 L.Ed.2d 134 (1995). "The Guidelines establish a step-by-step procedure for the Board to follow in making parole determinations for eligible inmates." *Id.* at 1497. The Board assigns each inmate a Crime Severity Level ("CSL") ranging from I to VII and a Parole Success Likelihood Score ("PSLS") of excellent, good, average, fair, or poor. *See id.*[1] The Parole Decision Grid (the "Grid") supplies a months-to-serve recommendation for each CSL/PSLS combination. *See id.* The actual TPM, however, is not necessarily set at the

time recommended by the Grid—the Board exercises significant discretion in making its parole decisions and freely may depart up or down from the Guidelines "benchmark" recommendation in fixing the TPM. *See id.* at 1497, 1500–03.

During the entire period that the Board has utilized the Guidelines, O.C.G.A. § 42–9–45(b) has required that "[a]n inmate serving a felony sentence or felony sentences shall only be eligible for consideration for parole after the expiration of nine months of his sentence or one-third of the time of the sentences, whichever is greater." In *Charron v. State Board of Pardons & Paroles*, 253 Ga. 274, 319 S.E.2d 453, 455 (1984), however, the Georgia Supreme Court construed this provision as precatory rather than mandatory, thus avoiding its invalidation on state constitutional grounds.[2] Consequently, between 1983 and 1991, the Board, to alleviate prison overcrowding, chose not to comply fully with § 42–9–45(b).

Rather, during this period, the Board maintained a two-tiered parole regime. The benchmark for the TPM of prisoners with CSLs of VI or VII was supplied, prior to any discretionary departure, by choosing the greater of (i) the existing grid recommendation or (ii) one-third of the court-imposed sentence. By contrast, the benchmark for the TPM of prisoners with CSLs of I through V was determined, prior to any discretionary departure, solely by reference to the Grid. For CSL V offenders,[3] the Grid recommended serving 20 months imprisonment for a PSLS of excellent, 25 months for a PSLS of good, 30 months for a PSLS of average, 40 months for a PSLS of fair, and 52 months for a PSLS of poor.

On January 22, 1991, the Board adopted a new rule, extending the one-third-of-sentence method for calculating the benchmark TPM already used for CSL VI and VII prisoners

---

1. The CSL I group consists of those offenders who committed the least serious felonies, and the CSL VII group of those offenders who committed the most serious felonies.

2. *See* Ga. Const. of 1983, Art. IV, Sec. II, Par. II(c) (1983) (providing only two situations, both inapplicable to § 42–9–45(b), in which Board's power to parole may be limited by statute).

3. The felonies classed as CSL V included relatively serious crimes such as aggravated assault, first-degree arson, statutory rape, child molestation, cruelty to children, incest, DUI vehicular homicide, robbery, and various drug offenses.

to CSL V offenders as well. The class filed suit, challenging retroactive application of the new rule. For the purpose of the ex post facto claim, the class in the district court consisted of all incarcerated CSL V offenders whose crimes were committed prior to January 22, 1991 and who were potentially disadvantaged by the application of the new rule—i.e. those prisoners whose court-imposed sentence was of such duration that one-third of that sentence exceeded the existing grid recommendation and consequently constituted their new benchmark TPM.[4] For the purpose of the due process claim, the plaintiff class consisted of a subclass of the ex post facto class—i.e. those prisoners who also were both convicted and sentenced prior to January 22, 1991.

The district court reasoned that because the Board's ultimate parole authority remained discretionary both before and after January 22, 1991, and TPMs were, by definition, only tentative, retroactive application of the new rule did not constitute an ex post facto violation. The district court also rejected the class's due process argument. Accordingly, the court granted summary judgment in favor of the Board.

## II.

■ Resolution of this appeal was held in abeyance pending our en banc decision in

*Sultenfuss* and then again pending the Supreme Court's decision in *California Dep't of Corrections v. Morales*, —— U.S. ——, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). In the meantime, this case has become moot as to a portion of the plaintiff class. For some, the case is moot simply because they by now have been paroled. *See United States ex rel. Graham v. United States Parole Commission*, 732 F.2d 849, 850 (11th Cir.1984) (where prisoner challenged change in parole regulations as ex post facto and sought parole determination under previous rules, appeal was mooted by parole).[5] The case also is moot as to others who have served one-third or more of their sentence but have not been paroled. The relief sought by the class was not actual release on parole but simply the setting of a *tentative* parole date pursuant to the old rather than the new rules—and to those few class members who have reached the new benchmark TPM date without having been paroled, that relief is now of no use. Accordingly, the appeal of this portion of the class is DISMISSED.

## III.

■ We next consider the merits of the remaining class members' ex post facto argument.[6] Article I, § 10, clause 1 of the United

---

4. More specifically, the class consisted of prisoners with a PSLS of excellent and a sentence of more than 60 months, PSLS of good and a sentence of more than 75 months, a PSLS of average and a sentence of more than 90 months, a PSLS of fair and a sentence of more than 120 months, or a PSLS of poor and a sentence of more than 156 months.

5. The instant case is distinguishable from *Jago v. Van Curen*, 454 U.S. 14, 21 n. 3, 102 S.Ct. 31, 36 n. 3, 70 L.Ed.2d 13 (1981), in which the Supreme Court determined that a prisoner's constitutional challenge to a certain parole determination was not moot despite his intervening release on parole. Critical to the Court's decision in *Jago* was the fact that, under the applicable state law, earlier placement *on* parole would have resulted in an earlier release *from* parole. *See id.* The plaintiff in *Jago* therefore suffered consequences from the delayed parole date that were not mooted by release on parole. *See id.*

Georgia law, by contrast, provides that normally "[n]o person who has been placed on parole shall be discharged therefrom by the board prior to the expiration of the term for which he

was sentenced...." *See* O.C.G.A. § 42–9–52. Furthermore, "earned time [is granted] to persons ... serving their sentences on parole ... to the same extent and in the same amount as if such person[s] were serving the sentence in custody." *Id.* Because, in Georgia, earlier placement on parole does not lead to earlier discharge from parole, the general rule of *Graham*, rather than the *Jago* exception, controls the mootness question in this case. *But see Sultenfuss v. Snow*, 7 F.3d 1543, 1551 n. 38 (11th Cir.1993) (opining that *Graham* is indistinguishable from and inconsistent with *Jago*), *vacated*, 14 F.3d 572 (11th Cir.), *on rehearing*, 35 F.3d 1494 (11th Cir.1994) (en banc), *cert. denied*, —— U.S. ——, 115 S.Ct. 1254, 131 L.Ed.2d 134 (1995).

6. We note at the outset that our recent conclusion that Georgia's parole system does not create a due process-protected liberty interest in parole, *see Sultenfuss*, 35 F.3d at 1500–03, does not by itself foreclose the instant ex post facto challenge. The Supreme Court repeatedly has held that the presence of an ex post facto violation is not dependent on the existence of a liberty interest, protected by due process, in the pertinent

States Constitution provides that "[n]o State shall ... pass any ... ex post facto Law." This clause incorporates "a term of art with an established meaning at the time of the framing of the Constitution," prohibiting:

'1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of commission of the offence, in order to convict the offender.'

*Collins v. Youngblood,* 497 U.S. 37, 41–42, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990) (quoting, in part, *Calder v. Bull,* 3 U.S. (Dall.) 386, 390, 1 L.Ed. 648 (1798)) (emphasis omitted). In this case, we consider the potential applicability of the third proscription, inquiring whether the TPM rule change retroactively [7] "increases the 'punishment' attached to [appellants'] crime[s]." *Morales,* —— U.S. at ——, 115 S.Ct. at 1601.[8]

The Supreme Court repeatedly has held that a prisoner need not show that he definitely *would* have served a lesser sentence under the previous legal regime in order to demonstrate an ex post facto violation. *See Miller,* 482 U.S. at 432, 107 S.Ct. at 2452; *Weaver,* 450 U.S. at 33, 101 S.Ct. at 966; *Lindsey v. Washington,* 301 U.S. 397, 401, 57 S.Ct. 797, 799, 81 L.Ed. 1182 (1937). In other words, the mere presence of *some* discretion both before and after the change in the law does not in and of itself foreclose an ex post facto claim. *See Miller,* 482 U.S. at 432–33, 107 S.Ct. at 2452–53.[9] At the same time, however, the Court has empha-

---

regulations. Although "[e]valuating whether a right is vested is important for claims under the Contracts and Due Process Clauses, which solely protect pre-existing entitlements ... [t]he presence or absence of an affirmative, enforceable right is not relevant ... to the ex post facto prohibition...." *Weaver v. Graham,* 450 U.S. 24, 30, 101 S.Ct. 960, 965, 67 L.Ed.2d 17 (1981) (emphasis omitted).

7. There is no dispute that the rule changes at issue in this case are retrospective, i.e. that they apply to events occurring before their enactment, changing the legal consequences of previously-completed acts. *See Miller v. Florida,* 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987) (Ex Post Facto Clause applies only to retrospective laws).

8. In *Akins v. Snow,* 922 F.2d 1558 (11th Cir.), *cert. denied,* 501 U.S. 1260, 111 S.Ct. 2915, 115 L.Ed.2d 1079 (1991), we held that (i) the Ex Post Facto Clause "applies to a change in parole eligibility," as "parole eligibility must be considered part of any sentence," *id.* at 1563; (ii) the Georgia Parole Board's rules and regulations concerning parole consideration are laws subject to the Ex Post Facto Clause, *see id.* at 1561; and (iii) retrospective application of a new rule requiring a decrease in the frequency of parole reconsideration hearings from every year to every eight years constituted an ex post facto violation. *See id.* at 1563–65. *But cf. Francis v. Fox,* 838 F.2d 1147, 1150 (11th Cir.1988) (Alabama work-release guidelines not laws for ex post facto purposes); *Dufresne v. Baer,* 744 F.2d 1543, 1549–50 (11th Cir.1984) (federal parole guidelines not laws under Ex Post Facto Clause) (alter-

native holding), *cert. denied,* 474 U.S. 817, 106 S.Ct. 61, 88 L.Ed.2d 49 (1985); *Kelly v. Southerland,* 967 F.2d 1531, 1532–33 (11th Cir.1992) (following *Dufresne*) (federal parole rescission guidelines not laws for ex post facto purposes).

In *Morales,* however, decided subsequent to *Akins,* the Supreme Court determined that retrospective application of a statute permitting a decrease in the frequency of parole reconsideration hearings from every year to every three years did not constitute an ex post facto violation. *See Morales,* —— U.S. at —— ——, 115 S.Ct. at 1600–05. In light of *Morales,* the continuing validity of *Akins* is questionable.

9. In *Miller,* the Supreme Court struck down as ex post facto a change in state sentencing guidelines that altered a criminal defendant's "presumptive" sentencing range from 3½–4½ years to 5½–7 years, despite the fact that the sentencing scheme remained somewhat discretionary both before and after the change in the law. *See Miller,* 482 U.S. at 425–28, 432–33, 107 S.Ct. at 2448–50, 2452–53. *Accord Raske v. Martinez,* 876 F.2d 1496, 1501 (11th Cir.) (retrospective application of rule changing amount of available incentive gain time violated Ex Post Facto Clause notwithstanding fact that awards were discretionary under both old and new regimes), *cert. denied,* 493 U.S. 993, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989); *Flemming v. Oregon Board of Parole,* 998 F.2d 721, 724–26 (9th Cir.1993) (Supreme Court's consistent teaching that prisoner need not show that she *certainly* would have served a lesser sentence under previous rule "leaves open the door to claims of ex post facto violations arising from laws with discretionary elements.").

sized that the Ex Post Facto Clause does not "forbid[ ] any legislative change that has any conceivable risk of affecting a prisoner's punishment." *Morales*, —— U.S. at ——, 115 S.Ct. at 1602. The pertinent question, then, is whether the change in the method for calculating the TPM "produce[d] a *sufficient risk* of increasing the measure of punishment attached to the covered crimes." *Id.* (emphasis added).[10]

In our view, the key to answering this question lies in the undisputed fact that, both before and after the January 22, 1991 rule change, the Board retained and *in fact exercised* virtually *unfettered* discretion to deviate both above and below the Guidelines-recommendation in setting the TPM. The statistics proffered by the plaintiff class demonstrate nothing more. Given this fact, the outcome of this appeal is dictated by the Supreme Court's recent decision in *Morales*. In that case, the Court noted that the parole rule change under consideration was unlikely to "extend any prisoner's actual period of confinement," *id.* at ——, 115 S.Ct. at 1605, as "[t]he amendment . . . left unchanged the substantive formula for securing any reductions to [the applicable] sentencing range," *id.* at ——, 115 S.Ct. at 1602, instead "simply 'alter[ing] the method to be followed' in fixing a parole release date under identical substantive standards." *Id.* (quoting in part *Miller*, 482 U.S. at 433, 107 S.Ct. at 2452–53).

The same is true of the TPM rule modification at issue in this case. Consequently, here, as in *Morales*, the degree of the Board's continuing parole discretion implies that the TPM rule change "create[d] only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes," and consequently did not result in an ex post facto violation. *Id.* at ——, 115 S.Ct. at 1603.[11]

## IV.

■ The class also challenges the TPM rule modification on substantive due process grounds, contending that class members were sentenced on the basis of inaccurate information because state trial judges were unaware, at the time of sentencing, that the length of the court-imposed sentence would have a direct impact on the calculation of the TPM. Our recent en banc decision in *Sultenfuss*, however, effectively disposes of this argument. In *Sultenfuss*, we held that Georgia prisoners do not have a due-process protected liberty interest in parole. *See Sultenfuss*, 35 F.3d at 1501–03. This holding compels the conclusion that the remaining plaintiff class in the instant case did not have a *derivative* due process right to be sentenced in reliance on an expectation of parole.

10. In a long line of cases, the Supreme Court previously had phrased the ex post facto inquiry differently, explaining that once a law was determined to be retrospective, the question was whether it "disadvantage[d] the offender affected by it." *Weaver*, 450 U.S. at 29, 101 S.Ct. at 964; *see also Miller*, 482 U.S. at 430, 107 S.Ct. at 2451; *Lindsey*, 301 U.S. at 401, 57 S.Ct. at 799. In *Morales*, however, the Court concluded that this earlier language was dictum, holding that "the focus of the ex post facto inquiry is not on whether a legislative change produces some ambiguous sort of disadvantage, nor . . . on whether an amendment affects a prisoner's opportunity to take advantage of provisions for early release . . . but on whether any such change . . . increases the penalty by which a crime is punishable." *Morales*, —— U.S. at —— n. 3, 115 S.Ct. at 1602 n. 3 (internal quotations omitted). We therefore now apply the *Morales* analytical framework.

11. *See also Paschal v. Wainwright*, 738 F.2d 1173, 1178–81 (11th Cir.1984) (rejecting ex post facto challenge to Florida's transition from ad

hoc parole system to one employing presumptive release date grid because plaintiff prisoners could not demonstrate a sufficient risk of increased punishment: "most important for our purposes, the ultimate parole decision remains committed to the Commission's discretion"); *Damiano v. Florida Parole and Probation Commission*, 785 F.2d 929, 933 (11th Cir.1986) (following *Paschal* ) (rejecting ex post facto challenge to same Florida rule change because "parole was a matter of complete discretion [before the change in the law] . . . [and] remains so even under the objective parole guidelines . . ., since parole is still ultimately a matter of discretion"); *Jonas v. Wainwright*, 779 F.2d 1576, 1577 (11th Cir.) (same), *cert. denied*, 479 U.S. 830, 107 S.Ct. 115, 93 L.Ed.2d 62 (1986); *Johnson v. Wainwright*, 772 F.2d 826, 827 (11th Cir.1985) (same); *cf. Conlogue v. Shinbaum*, 949 F.2d 378, 381–82 (11th Cir.1991) (applying *Paschal* to reject ex post facto challenge to discretionary Alabama incentive good time rule), *cert. denied*, —— U.S. ——, 113 S.Ct. 123, 121 L.Ed.2d 79 (1992).

## V.

For the foregoing reasons, the district court's grant of summary judgment in favor of the Board is AFFIRMED.

DISMISSED IN PART, AFFIRMED IN PART.