**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GARY LEE ROLLER,
Plaintiff-Appellant,

v.

WILLIAM E. GUNN, Executive
Director of the South Carolina
Department of Probation, Parole and

Pardon Services; SOUTH CAROLINA
DEPARTMENT OF PROBATION, PAROLE
AND PARDON SERVICES,
Defendants-Appellees,

UNITED STATES OF AMERICA,
Intervenor.

No. 96-6992

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Henry M. Herlong, Jr., District Judge.
(CA-90-3054-3-20-J)

Argued: December 2, 1996

Decided: February 19, 1997

Before WILKINSON, Chief Judge, and RUSSELL and HALL,
Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Russell joined. Judge Hall wrote an opinion
concurring in part and dissenting in part.

_____

**COUNSEL**

**ARGUED:** Rochelle Romosca McKim, W. Gaston Fairey, FAIREY, PARISE & MILLS, P.A., Columbia, South Carolina, for Appellant. Carl Norman Lundberg, Chief Legal Counsel, SOUTH CAROLINA DEPARTMENT OF PROBATION, PAROLE AND PARDON SERVICES, Columbia, South Carolina, for Appellees. Richard Alan Olderman, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor. **ON BRIEF:** Charles Molony Condon, Attorney General, Donald J. Zelenka, Assistant Deputy Attorney General, Reginald I. Lloyd, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Columbia, South Carolina, for Appellees. Frank W. Hunger, Assistant Attorney General, J. Rene Josey, United States Attorney, Barbara L. Herwig, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor.

_____

**OPINION**

WILKINSON, Chief Judge:

Appellant, Gary Lee Roller, challenges the constitutionality of section 804 of the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321, §§ 801-810 (Apr. 26, 1996), which requires prisoners proceeding in forma pauperis to pay a partial filing fee before filing a lawsuit or proceeding with an appeal. We think the Act represents a legitimate exercise of Congress' power to reduce frivolous lawsuits in the federal courts. We reject Roller's contentions that the filing fee requirement imposes an unconstitutional barrier on access to the courts or that it violates the Constitution's equal protection guarantee.

Roller also appeals the district court's conclusion that the retrospective application of amendments to South Carolina's parole procedures does not constitute a violation of the Ex Post Facto Clause. The Supreme Court's recent decision in California Dept. of Corrections v. Morales, 115 S. Ct. 1597 (1995), permits the states to adopt

changes to their parole procedures which produce no more than a speculative possibility of affecting a prisoner's punishment. Under Morales, the changes to South Carolina's parole procedures do not violate the Ex Post Facto Clause. Accordingly, we affirm the judgment of the district court.

I.

In early 1983, Gary Lee Roller was convicted of voluntary manslaughter and grand larceny in South Carolina state court for crimes committed on December 13, 1982. On March 25, 1983, he was sentenced to thirty-five years imprisonment.

In December 1990, Roller filed a complaint under 42 U.S.C. § 1983 challenging the application of amendments to the parole laws of South Carolina on ex post facto grounds. The amendments, passed in 1986, modified South Carolina Code section 24-21-645 so that a prisoner convicted of committing a violent crime would only have his case reviewed every two years after an initial negative parole determination rather than every year. Additionally, the amendments required a two-thirds majority of the parole board to authorize parole for violent offenders rather than a simple majority. By its terms, the amended version of section 24-21-645 applied to Roller despite the fact that he had committed his crimes and been convicted prior to its enactment.

The district court entered judgment for the South Carolina Department of Probation, Parole, and Pardon Services, but was reversed by this court in Roller v. Cavanaugh, 984 F.2d 120 (4th Cir. 1993). The case was remanded with instructions to grant declaratory relief in favor of Roller.

In April 1995, the Supreme Court decided California Dept. Of Corrections v. Morales, 115 S. Ct. 1597 (1995). Morales held that the retroactive application of a California statute which changed the frequency of parole hearings for multiple murderers from every year to once every three years did not violate the Ex Post Facto Clause. In January 1996, South Carolina, arguing that Morales represented a significant change in the law, moved under Fed. R. Civ. P. 60(b) for modification of the court's order declaring the retrospective applica-

3

tion of the 1986 amendments to section 24-21-645 unconstitutional. On June 5, 1996, the district court concluded on the basis of Morales that "the application of § 24-21-645 to Roller does not violate the Ex Post Facto Clause." Roller v. Gunn, 932 F. Supp. 729, 730 (D.S.C. 1996). Roller then filed the instant appeal.

On appeal, Roller moved this court to declare the filing fee requirement of the PLRA and a similar requirement providing for the payment of costs unconstitutional. Roller has paid the full amount of the $105 filing fee under protest pending our decision.

II.

A.

We turn initially to Roller's contentions that the filing fee provisions of the PLRA constitute an unconstitutional barrier to access to the courts and violate the constitutional guarantee of equal protection.

Congress has long regulated the access of indigent litigants to the federal judicial system. The first federal in forma pauperis ("IFP") statute was enacted in 1892. Act of July 20, 1892, ch. 209, 27 Stat. 252 (codified as amended at 28 U.S.C. § 1915). Concerned that citizens were being denied their day in court, Congress proposed to "open the United States courts to a class of American citizens who have rights to be adjudicated, but are now excluded practically for want of sufficient money or property to enter the courts under their rules." H.R. Rep. No. 1709, 52d Cong., 1st Sess. 1 (1892). Despite Congress' admonition that "[t]he proposed law will not admit of vexatious litigation," id., the statute's noble purpose has been threatened by a flood of meritless lawsuits.

Unsurprisingly, prisoners proved responsible for much of this litigation. In some instances, individual prisoners have filed an astonishing number of frivolous lawsuits. See, e.g., Shieh v. Kakita, 116 S. Ct. 1311 (1996) (prisoner prospectively barred from filing petitions for certiorari in forma pauperis after filing 10 frivolous petitions in less than three years); In re McDonald, 489 U.S. 180, 184 (1989) (prisoner prospectively barred from using in forma pauperis procedures to

4

file extraordinary writs after 73 frivolous filings between 1971 and 1989); In re Green, 669 F.2d 779, 781 (D.C. Cir. 1981) (prisoner filed "between 600 and 700 complaints in the federal and state courts"). In 1995, prisoners brought over 25% of the civil cases filed in the federal district courts. Administrative Office of the United States Courts, 1995 Federal Court Management Statistics 167. In this circuit alone, IFP filings accounted for almost half of the court's 1995 caseload, Nasim v. Warden, Maryland House of Correction, 64 F.3d 951, 954 n.2 (4th Cir. 1995) (en banc), and prisoners were responsible for 75% of those filings. Id. at 953-54 n.1.

Congress recognized that the explosion of IFP litigation presents problems for our legal system. It was obviously concerned that the limited resources of the federal judiciary not be expended on cases whose frivolity was manifest, but whose sheer numerosity represented a formidable and time consuming task. As the Supreme Court has noted, "[t]he goal of fairly dispensing justice . . . is compromised when the Court is forced to devote its limited resources to the processing of repetitious and frivolous requests." In re Sindram, 498 U.S. 177, 179-80 (1991).

Finding that the proliferation of prisoner litigation was due significantly to the lack of economic disincentives to filing meritless cases, Congress passed the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321, §§ 801-810 (Apr. 26, 1996). The goal of the PLRA amendments to the in forma pauperis statute, 28 U.S.C. § 1915, is straightforward:

> Section 2 will require prisoners to pay a very small share of the large burden they place on the Federal judicial system by paying a small filing fee upon commencement of lawsuits. In doing so, the provision will deter frivolous inmate lawsuits. The modest monetary outlay will force prisoners to think twice about the case and not just file reflexively. Prisoners will have to make the same decision that law-abiding Americans must make: Is the lawsuit worth the price?

141 Cong. Rec. at S7526 (May 25, 1995) (statement of Senator Kyl) (citation omitted).

5

The PLRA thus makes several changes to 28 U.S.C.§ 1915. The Act requires prisoners seeking IFP status to execute an affidavit attesting to their impoverishment and to file with the court a certified copy of their prison trust account. 28 U.S.C. § 1915(1) & (2). Moreover, under the PLRA amendments,

> if a prisoner brings a civil action or files an appeal in forma pauperis, the prisoner shall be required to pay the full amount of a filing fee. The court shall assess, and when funds exist, collect, as a partial payment of any court fees required by law, an initial partial filing fee of 20 percent of the greater of --
>
> (A) the average monthly deposits to the prisoner's account; or
>
> (B) the average monthly balance in the prisoner's account for the 6-month period immediately preceding the filing of the complaint or notice of appeal.
>
> (2) After payment of the initial partial filing fee, the prisoner shall be required to make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account. The agency having custody of the prisoner shall forward payments from the prisoner's account to the clerk of the court each time the amount in the account exceeds $10 until the filing fees are paid.

28 U.S.C. § 1915(3)(b)(1) & (b)(2). The amendments also state that "[i]n no event shall a prisoner be prohibited from bringing a civil action or appealing a civil or criminal judgment for the reason that the prisoner has no assets and no means by which to pay the initial partial filing fee." 28 U.S.C. § 1915(4).

In addition, the PLRA amendments provide that if a district court in its discretion awards a judgment against a prisoner and includes costs, the prisoner "shall be required to pay the full amount of the costs ordered" and "shall be required to make payments for costs under this subsection in the same manner as is provided for filing fees . . . ." 28 U.S.C. § 1915(f)(2)(A) & (B).

6

B.

Roller first contends that the PLRA amendments to 28 U.S.C. § 1915 constitute a violation of his constitutional right of access to the courts. See Bounds v. Smith, 430 U.S. 817 (1977). He argues that by imposing liability for fees and costs on inmates wishing to pursue appeals, the PLRA amendments have the practical effect of foreclosing access for those prisoners who are unable or unwilling to assume the financial burdens imposed by the statute.

Roller's mistakes are fundamental. To begin with, the right of access to federal courts is not a free-floating right, but rather is subject to Congress' Article III power to set limits on federal jurisdiction. Indeed, Congress is neither "constitutionally required to create Article III courts to hear and decide cases within the judicial power of the United States," nor to vest those courts that are created "with all the jurisdiction it was authorized to bestow under Article III." Palmore v. United States, 411 U.S. 389, 400-01 (1973). Congress is no more compelled to guarantee free access to federal courts than it is to provide unlimited access to them. The Supreme Court has never recognized an "unlimited rule that an indigent at all times and in all cases has the right to relief without the payment of fees." United States v. Kras, 409 U.S. 434, 450 (1973). If we were to adopt Roller's argument, all filing fees would be unconstitutional, which, of course, they are not. "The correct principle is that reasonable costs may be imposed on persons who want to sue." Lumbert v. Illinois Dept. of Corrections, 827 F.2d 257, 259 (7th Cir. 1987). **1**

_____

**1** The Supreme Court has struck down filing fee requirements in certain state court cases involving domestic disputes. However, these cases address situations where a filing fee presents an insurmountable barrier to the protection of certain fundamental rights. For example, in M.L.B. v. S.L.J., 65 U.S.L.W. 4035 (U.S. Dec. 16, 1996), the Supreme Court held that Mississippi could not condition an appeal from the termination of parental rights on the payment of a $2,532.36 record preparation fee. Similarly, in Boddie v. Connecticut, 401 U.S. 371 (1971), the Court held that Connecticut could not deny a married couple access to divorce proceedings due to an inability to pay court fees. However, the Court has made clear that in "the mine run of cases" which do not involve "state controls or intrusions on family relationships" filing fees may be required. See M.L.B., 65 U.S.L.W. at 4041.

7

Indeed, this Court has already upheld the practice of requiring prisoners to pay filing fees. In Evans v. Croom, 650 F.2d 521 (4th Cir. 1981), we approved a district court rule requiring partial filing fees in prisoner IFP lawsuits. The rule that we approved bears many similarities to the scheme adopted by the PLRA. The district court in Evans had instructed the clerk to obtain a certified copy of each plaintiff prisoner's trust fund account for the six month period preceding the lawsuit. The court further instructed the clerk to require payment of a partial filing fee not to exceed 15% of the amount of money received in the trust fund account during the previous six month period. We upheld the district court's order, observing that prisoners had no financial disincentives to litigate, hence "nothing to lose and everything to gain" from suing. Id. at 523. We also noted that the district court's order simply forced the prisoner to weigh whether the "merit of the claim" was worth "the cost of pursuing it." Id. at 524 (citation omitted).

We recently reaffirmed Evans in Nasim v. Warden, Maryland House of Correction, 64 F.3d 951 (4th Cir. 1995) (en banc), observing that some financial accountability could be built into the system that would retain access to the courts "without overwhelming the efficient administration of justice with meritless cases." Id. at 954 & n.3. Nine other circuits have upheld the imposition of partial filing fees on IFP plaintiffs. See In re Stump, 449 F.2d 1297, 1298 (1st Cir. 1971); In re Epps, 888 F.2d 964, 967 (2d Cir. 1989); Bullock v. Suolmela, 710 F.2d 102, 103 (3d Cir. 1983); Smith v. Martinez, 706 F.2d 572, 574 (5th Cir. 1983); Clark v. Ocean Brand Tuna , 974 F.2d 48, 50 (6th Cir. 1992); Bryan v. Johnson, 821 F.2d 455, 458 (7th Cir. 1987); In re Williamson, 786 F.2d 1336, 1339-41 (8th Cir. 1986); Olivares v. Marshall, 59 F.3d 109, 111 (9th Cir. 1995); Collier v. Tatum, 722 F.2d 653, 655 (11th Cir. 1983).

As meritless as his filing fee contention is Roller's claim that he is denied access to the courts by the PLRA provision requiring pay-

_____

Roller's case is not implicated by M.L.B. or Boddie. It clearly does not involve "state controls or intrusions on family relationships." It also does not present the sort of insurmountable barrier to filing suit considered in those cases.

8

ment of costs assessed against a prisoner, 28 U.S.C. § 1915(f)(2). In Flint v. Haynes, 651 F.2d 970 (4th Cir. 1981), this circuit held that "a district court is empowered to award costs even when it has previously granted a litigant the benefits" of IFP status. Id. at 972. We went on to reject the argument that requiring payment of costs infringed an IFP litigant's right of access to the courts:

> [T]he appellants argue that in order to insure that indigent civil rights litigants have access to the courts to redress their grievances, costs should rarely be assessed in these circumstances. However, when costs are assessed only in extreme or exceptional cases, those persons granted leave to proceed in forma pauperis have virtually nothing to lose and everything to gain, and the purpose of § 1915 -- equal access for the poor and rich -- is distorted. Non-indigents who contemplate litigation are routinely forced to decide whether their claim is worth it. We see no reason to treat indigents differently in this respect.

Id. at 973 (citations omitted); see also Weaver v. Toombs, 948 F.2d 1004, 1008 (6th Cir. 1991); Harris v. Forsyth , 742 F.2d 1277, 1277-78 (11th Cir. 1984).

In effect, the PLRA simply follows the course set by the federal courts in cases like Evans v. Croom and Flint v. Haynes. The statute's approach is hardly draconian. Section 1915 requires a modest initial filing fee before a case may proceed, 28 U.S.C. § 1915(b)(1), and thereafter a prisoner is required to pay only "20 percent of the preceding month's income credited to the prisoner's account" until the total fee is paid, 28 U.S.C. § 1915(b)(2). To further ensure that prisoners need not "totally deprive themselves of those small amenities of life which they are permitted to acquire in a prison or mental hospital beyond the food, clothing, and lodging already furnished by the state," Evans, 650 F.2d at 524 (citation omitted), section 1915 allows payment to be taken from the prisoner's account only where "the amount in the account exceeds $10 . . . ." 28 U.S.C. § 1915(b)(2). Furthermore, the PLRA provides that "[i]n no event shall a prisoner be prohibited from bringing a civil action or appealing a civil or criminal judgment for the reason that the prisoner has no assets and no means by which to pay the initial partial filing fee." 28 U.S.C.

9

§ 1915(b)(4). These mild steps do not begin to impose an unconstitutional burden on a prisoner's access to the courts.

Roller maintains that even though the PLRA amendments include safeguards to ensure the truly indigent will have access to the courts, the practical effect of the amendments will be that prisoners with other expenses will be unable to afford lawsuits. This argument, however, misses the entire point of the statute. Requiring prisoners to make economic decisions about filing lawsuits does not deny access to the courts; it merely places the indigent prisoner in a position similar to that faced by those whose basic costs of living are not paid by the state. Those living outside of prisons cannot file a lawsuit every time they suffer a real or imagined slight. Instead, they must weigh the importance of redress before resorting to the legal system. If a prisoner determines that his funds are better spent on other items rather than filing a civil rights suit, "he has demonstrated an implied evaluation of that suit" that the courts should be entitled to honor. Lumbert, 827 F.2d at 260.

C.

Roller contends finally that the PLRA amendments violate the Constitution's guarantee of equal protection. Prisoners are not a suspect class. See Pryor v. Brennan, 914 F.2d 921, 923 (7th Cir. 1990); Moss v. Clark, 886 F.2d 686, 690 (4th Cir. 1989). Nor is indigency a suspect classification. See Harris v. McRae , 448 U.S. 297, 323 (1980); Maher v. Roe, 432 U.S. 464, 471 (1977). Moreover, as we have explained above, the PLRA amendments do not burden any fundamental rights. We therefore review the PLRA amendments under a rational basis standard. "Unless a classification trammels fundamental personal rights or is drawn upon inherent suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discrimination and require only that the classification challenged be rationally related to a legitimate state interest." City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976).

The PLRA amendments easily satisfy the rational basis standard. Congress has acted in an area in which it has important responsibilities. As the Supreme Court recognized in Hanna v. Plumer, 380 U.S. 460 (1965), "the constitutional provision for a federal court system

10

(augmented by the Necessary and Proper Clause) carries with it congressional power to make rules governing the practice and pleadings in those courts . . . ." Id. at 472. Moreover, the goal of the Act -- curbing frivolous IFP litigation -- is clearly proper. We have earlier discussed the legitimacy of this interest, and we shall not repeat that discussion here.

Roller, however, maintains that the means Congress used to further its clearly legitimate goal are irrational, contending that Congress impermissibly singled out the prison population for the filing fee requirement.**2** We disagree. There are a host of rational grounds for imposing the filing fee requirement on prisoners."The Constitution does not require things which are different in fact . . . to be treated in law as though they were the same." Tigner v. Texas, 310 U.S. 141, 147 (1940). Prisoners are not similarly situated to non-prisoners. They have their basic material needs provided at state expense. They are further provided with free paper, postage, and legal assistance. They often have free time on their hands that other litigants do not possess. See Lumbert, 827 F.2d at 259. As a result, the federal courts have observed that prisoner litigation has assumed something of the nature of a "recreational activity." See, e.g., Gabel v. Lynaugh, 835 F.2d 124, 125 n.1 (5th Cir. 1988). Whether recreational or not, there has been

---

**2** Roller, relying primarily on Rinaldi v. Yeager, 384 U.S. 305 (1966), contends that the PLRA amendments do not satisfy the requirements of rationality. Roller's reliance on Rinaldi, however, is misplaced. In Rinaldi, the Supreme Court found a New Jersey statute violated equal protection because it required a single class of unsuccessful criminal appellants -- imprisoned indigents -- to reimburse the state for the costs of trial transcripts. Indigent appellants who had been convicted of a crime and had been unsuccessful on appeal, but who had received punishments other than imprisonment, were not subject to this requirement. The Supreme Court found there was simply no basis for this distinction. As the Supreme Court subsequently characterized its decision, "the New Jersey distinction . . . was invidious and without rationality for it was not related to the fiscal objectives of the statute and rested on no administrative convenience." Schlib v. Kueble, 404 U.S. 357, 369 (1971).

Rinaldi simply is not applicable here. Congress has not singled out a single class of appellants to pay a "penalty" if unsuccessful. Instead, Congress has uniformly imposed a requirement on those prisoners wishing to take advantage of the privilege of IFP status.

11

a far greater opportunity for abuse of the federal judicial system in the prison setting. See 141 Cong. Rec. S7256 (May 25, 1995) (statement of Sen. Kyl) (noting that over one-fourth of civil cases filed in federal district courts were filed by prisoners, and that the vast majority of these cases ended in no relief for the prisoner). Congress could rationally have concluded that this abuse of the federal judicial system by inmates was likely to continue absent significant changes in the IFP statute.

There are other reasons why Congress may have viewed the prison setting as uniquely appropriate for a filing fee requirement. Many federal courts had adopted varied plans for prisoner filings similar to the PLRA amendments. Congress may have wanted to establish uniform national standards for the handling of such cases in the federal courts. Congress may also have wanted to establish a means of ensuring that those who claim IFP status truly are indigent. The PLRA amendments establish a uniform method for making such determinations among prisoners. Furthermore, because prisoners are under the control of the state, it is administratively easier for the courts to check the finances of inmates than other IFP plaintiffs. Congress may have limited the filing fee requirements to prisoners because of this administrative convenience. After all, a legislature "may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." Bowen v. Owens, 476 U.S. 340, 347 (1986) (quoting Williamson v. Lee Optical Co., 348 U.S. 483, 489 (1955)).

In sum, the equal protection question is not a close one. The legislative solution is entirely rational, does not violate any fundamental rights, and does not single out a suspect class for disparate treatment. We therefore hold the PLRA amendments to 28 U.S.C.§ 1915 to be constitutional.

III.

Roller contends that the district court erred when it held the application of section 24-21-645 constitutional. He maintains that the Supreme Court's decision in California Dept. of Corrections v. Morales, 115 S. Ct. 1597 (1995), did not call into question the valid-

12

ity of this court's ruling in Roller v. Cavanaugh, 984 F.2d 120 (4th Cir. 1993).**3**

We disagree. The Cavanaugh decision reasoned that any retroactive reduction in the frequency of parole consideration would violate the Ex Post Facto Clause because such a change would necessarily eliminate an opportunity for early release. This is precisely the argument the Supreme Court rejected in Morales. 116 S. Ct. at 1602-03; see also Jones v. Georgia State Board of Pardons and Paroles, 59 F.3d 1145, 1149 n.8 (11th Cir. 1995) (noting that Morales called into question the validity of Akins v. Snow, 922 F.2d 1558 (11th Cir. 1991), a case which rested on the same reasoning as Cavanaugh). Indeed, as ours and other circuits have already recognized, Morales holds that the Ex Post Facto Clause does not foreclose every change in state parole procedures that poses a speculative risk of increasing a prisoner's punishment. See Artway v. New Jersey, 81 F.3d 1235, 1260-61 (3d Cir. 1996); Hamm v. Latessa, 72 F.3d 947, 959 (1st Cir. 1995); United States v. Reese, 71 F.3d 582, 591 (6th Cir. 1995); Allison v. Kyle, 66 F.3d 71, 74-75 (5th Cir. 1995); Hill v. Jackson, 64 F.3d 163, 168 (4th Cir. 1995); Jones, 59 F.3d at 1149-50.

In Morales, the Supreme Court considered the retroactive application of a California statute which changed the frequency of parole consideration for multiple murderers from every year to every three

_____

**3** Prior to this circuit's decision in Roller v. Cavanaugh, the South Carolina Supreme Court had held that section 24-21-645 did not violate the Ex Post Facto Clauses of either the United States or South Carolina Constitutions. Gunter v. South Carolina, 378 S.E.2d 443, 444 (S.C. 1989). However, in Griffin v. South Carolina, 433 S.E.2d 862, 863-64 (S.C. 1993), the South Carolina Supreme Court, relying on Roller v. Cavanaugh, reversed Gunter. Given that the Griffin decision was wholly predicated on federal precedent, there is no independent state law ground that would moot our consideration of this issue. As the Supreme Court stated in Michigan v. Long, 463 U.S. 1032, 1040-41 (1983), "when, as in this case, a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so."

13

years. Finding that the California law involved "only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes," 115 S. Ct. at 1603, the Court held that California's change in parole procedures did not violate the <u>Ex Post Facto</u> Clause. While the Court declined to express a view "as to the constitutionality of any of a number of other statutes that might alter the timing of parole hearings," <u>id</u>. at 1603 n.5, it did clarify the principles we must use to analyze the constitutionality of changes in parole procedures.

<u>Morales</u> instructs that a law which changes the frequency of parole hearings will implicate the <u>Ex Post Facto</u> Clause only when "it produces a sufficient risk of increasing the measure of punishment attached to the covered crimes." <u>Id</u>. at 1603. The sufficient risk inquiry "cannot be embraced within a formula or stated in a general proposition," but rather is a matter of "degree." <u>Id</u>. However, where the legislative adjustment creates only a "speculative and attenuated" risk of increasing punishment it will withstand constitutional attack. <u>Id</u>.; <u>Dobbert v. Florida</u>, 432 U.S. 282, 294 (1977).

The South Carolina law we examine today bears a strong resemblance to the California statute sustained in <u>Morales</u>. Neither the California law nor the South Carolina statute increase in any way the actual sentence of imprisonment. Like the California measure, the South Carolina law applies only to prisoners convicted of violent crimes -- prisoners which the South Carolina legislature determined were unlikely to receive release on parole. <u>See Morales</u>, 115 S.Ct. at 1603. As with California's law, section 24-21-645 "has no effect on the date of any prisoner's initial parole suitability hearing; it affects the timing only of <u>subsequent</u> hearings." <u>Id</u>. at 1604 (emphasis in original). Like the California provision, the South Carolina law has not changed the substantive standards for qualifying for parole; parole determinations remain within the total discretion of the parole board. <u>See id</u>. at 1602. However, unlike the California statute, which changed the frequency of parole hearings from once a year to once every <u>three</u> years, section 24-21-645 has only changed the frequency of parole hearings to every <u>two</u> years.

Despite these similarities and the fact that the South Carolina statute calls for a <u>greater</u> frequency of parole hearings than the statute

14

upheld in Morales, Roller contends that Morales should be limited to its facts. He argues that since section 24-21-645 does not include every provision included in the California statute, the retroactive application of the South Carolina law constitutes a violation of the Ex Post Facto Clause. For example, the California statute requires the parole board to make a factual finding that "it is not reasonable to expect that parole would be granted at a hearing during the following years," before it may defer future parole hearings. Morales, 115 S. Ct. at 1604 (citation omitted). Roller maintains that since no individualized findings are required under the South Carolina law, the possibility that he might experience a change of circumstances that would increase his chances of parole during the year his hearing was deferred are significantly greater than under the statute sustained in Morales. He thus contends that section 24-21-645 has increased significantly his punishment by foreclosing for a year an opportunity for release.

Roller's claim, however, boils down to mere speculation about his release. Such conjecture is insufficient under Morales to establish a violation of the Ex Post Facto Clause. In South Carolina, the determination of parole is subject to the broad discretion of the parole board. S.C. Code Ann. § 24-21-645. Forecasts on how the board might decide to exercise its discretion in any given case are merely in the nature of conjecture. Roller simply fails "to provide support for his speculation that . . . prisoners subject to [24-21-645] might experience an unanticipated change that is sufficiently monumental to alter their suitability for release on parole." Morales , 115 S. Ct. at 1604. Furthermore, as the district court noted, there is nothing on the face of section 24-21-645 that limits the parole board's authority to schedule expedited hearings if presented with suitable circumstances. Roller v. Gunn, 932 F. Supp. 729, 730 (D.S.C. 1996). In Morales, this same consideration led the Supreme Court to conclude that even if a prisoner's circumstances drastically changed during the period that his parole hearing had been delayed, "there is no reason to conclude that the amendment will have any effect on any prisoner's actual term of confinement." 115 S. Ct. at 1604.

Roller also contends that section 24-21-645 effects an impermissible change in the standards for parole because it requires a two-thirds vote of the parole board rather than the simple majority required by

15

the predecessor statute. This argument is foreclosed by <u>Dobbert v. Florida</u>, 432 U.S. 282 (1977). In <u>Dobbert</u>, the trial judge overruled the jury's recommendation of life imprisonment and imposed a sentence of death. The criminal defendant claimed that the statute which allowed a trial judge to determine finally, after a jury recommendation, whether the death sentence was appropriate violated the <u>Ex Post Facto</u> Clause because under the old statute the final death penalty determination would have been made by a majority of the jury. The Supreme Court rejected this claim because it was based on conjecture, stating, "[I]t certainly cannot be said with assurance that, had his trial been conducted under the old statute, the jury would have returned a verdict of life." <u>Id</u>. at 294.

Like the claim of the petitioner in <u>Dobbert</u>, Roller's claim is speculative. There is no way of knowing whether a particular board member's vote would be the same under the new two-thirds majority rule as it would have been under the old rule. As the Supreme Court noted in <u>Dobbert</u>, "[The jurors] may have chosen leniency when they knew that that decision rested ultimately on the shoulders of the trial judge, but might not have followed the same course if their vote were final." <u>Id</u>. at 294 n.7. Similarly, parole board members might be more likely to vote for granting parole under the two-thirds rule, knowing that any favorable decision must be concurred in by a greater number of their colleagues.

<u>Morales</u> likewise compels us to uphold the retrospective application of the two-thirds vote requirement. The Court specifically cautioned the judiciary against the "micromanagement of an endless array of legislative adjustments to parole and sentencing procedures." 116 S. Ct. at 1603. If we were to invalidate the two-thirds majority requirement, we would be ignoring the Court's admonition and opening the door to a host of challenges to state parole practices. For example, a state that allowed parole on a simple majority vote would violate the <u>Ex Post Facto</u> Clause if the parole board's membership changed from three to four members because a prisoner would have to convince three-fourths of the board rather than two-thirds in order to gain parole. If <u>Morales</u> stands for anything, it stands for the proposition that this sort of judicial fine-tuning is not appropriate. <u>See</u> <u>Cavallaro v. Groose</u>, 908 S.W.2d 133, 136 (Mo. 1995) (holding that a change from a three member board to a five member board did not

16

violate the Ex Post Facto Clause). The two-thirds majority requirement is simply a procedural change in South Carolina's parole system, and "[e]ven though it may work to the disadvantage of a defendant, a procedural change is not ex post facto." Dobbert, 432 U.S. at 293.

In the end, if we adopt Roller's arguments, we would be required to strike down every retrospective application of parole procedures which do not conform exactly to the California statute considered in Morales. We have already rejected this proposition. In Hill v. Jackson, 64 F.3d 163 (4th Cir. 1995), this court upheld a change in Virginia's parole law which applied to a group of prisoners broader than the class of prisoners affected by the California law upheld in Morales. Instead of being limited to multiple murderers, the Virginia parole policy deferred parole hearings for up to three years for those prisoners serving life sentences or serving sentences of 70 years or more for a violent offense. Yet we upheld the Virginia procedure, noting among other things that, "[a]s in Morales, the Parole Board's policy has no effect on the substantive standards for scheduling an inmate's initial parole eligibility date, nor does it change the criteria for determining either an inmate's suitability for parole or his or her release date." Id. at 169. These same features characterize the South Carolina law as well.

Our federal system does not require that every state model its parole procedures after those of California or indeed of any other state. "It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." Preiser v. Rodriguez, 411 U.S. 475, 491-92 (1973). Our federalism allows states to try different solutions to the problems of confinement and release, and to adopt diverse approaches to parole procedures for those within state custody. The rejoinder that states can experiment with parole procedures, but only prospectively, is no rejoinder at all -- that position would require that states process inmates by at least two different sets of rules in every institution.

The South Carolina statute represents a limited change in parole procedures designed to relieve the state "from the costly and time consuming responsibility of scheduling parole hearings" for prisoners

17

who have a low probability of being released. <u>Morales</u>, 115 S. Ct. at 1602 (citation omitted). The lesson of <u>Morales</u> is that the state may adopt such a change unless a prisoner can "show `with assurance' . . . that he would have received parole under the old system." <u>Johnson v. Gomez</u>, 92 F.3d 964, 968 (9th Cir. 1996) (citations omitted). At best, Roller can contend that he will miss an "<u>opportunity</u> to take advantage of provisions for early release," and under <u>Morales</u> that is simply insufficient to establish an <u>ex post facto</u> violation. 115 S. Ct. at 1602 n.3 (emphasis in original).

IV.

We hold that the Prison Litigation Reform Act's filing fee and payment of costs requirements are constitutional. We affirm the district court's judgment that the application of section 24-21-645 to plaintiff does not constitute a violation of the <u>Ex Post Facto</u> Clause.

<u>AFFIRMED</u>

HALL, Circuit Judge, concurring in part and dissenting in part:

I agree that the PLRA withstands the constitutional attacks levelled upon it by Roller, and I therefore concur in Part II of Chief Judge Wilkinson's opinion. I do not believe, however, that <u>Morales</u> dictates the result reached by the majority in Part III of its opinion, and, therefore, I dissent from the affirmance of the district court's judgment that South Carolina's amendment to its parole statutes is constitutional.

A

In concluding that the California statute did not violate the Ex Post Facto clause because it "create[d] only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes," the Supreme Court in <u>Morales</u> emphasized two features of the statute: (1) the amended procedure "applies only to a class of prisoners for whom the likelihood of release on parole is quite remote," and (2) the Parole Board's authority was carefully tailored to achieve the amendment's purpose of eliminating hearings "for prisoners who have no chance of being

18

released." Morales, 115 S.Ct. at 1603-04. Unlike the situation presented in Hill v. Jackson, 64 F.3d 163 (4th Cir. 1995), where we applied the Morales analysis to uphold a Virginia statute that changed the frequency of parole-eligibility hearings, the South Carolina amendments do not "bear[ ] a strong resemblance to the California statute sustained in Morales," ante at 14. Comparison of the three statutes (California, Virginia,**1** and South Carolina) manifests that the degree of change effected by the South Carolina law is one that is of "sufficient moment to transgress the constitutional prohibition." Morales, 115 S. Ct. at 1603 (quoting Beazell v. Ohio, 269 U.S. 167, 171 (1925)).

B

The statute in Morales applies only to prisoners who had been "convicted of more than one offense involving the taking of a life." The Virginia policy considered in Hill applies "only to a narrow class of inmates," estimated by the Parole Board to comprise some 3% of the prison population, who are serving (1) a life sentence, or (2) a sentence or sentences totalling at least 70 years for at least one violent offense and for which there are at least 10 years left to be served before mandatory release. Hill, 64 F.3d at 169. Clearly, then, these two statutes affect only the worst of the worst.

The South Carolina statute, on the other hand, applies to all inmates convicted of a "violent crime," as that term is defined in S.C. Code Ann. § 16-1-60 (Law. Co-op. Supp. 1995)."Violent crime" includes far more offenses than those covered by the deferral rules in California and Virginia. For instance, § 16-1-60 includes crimes for which only a 1-10 year sentence is prescribed. See, e.g., S.C. Code § 44-53-370(e)(1)(a) (Law. Co-op. Supp. 1995) (sale, cultivation, possession, etc., of 10-100 pounds of marijuana). We are simply left to guess about how many South Carolina inmates are affected by this provision because the district court made no findings in this regard, and the State makes no effort on this appeal to point out any legislative findings or other authority that would suggest that the amendment

_____

**1** Although Hill dealt with a Parole Board policy that was appreciably narrower in scope than the statute permitted, I will use the term "statute" in referring to the law involved in that case.

19

in question "applies only to a class of prisoners for whom the likelihood of release on parole is quite remote." Morales, 115 S. Ct. at 1603. A comparison of the facial differences among the three groups affected -- multiple murderers in California, those with at least a 70-year sentence in Virginia, and certain drug traffickers, burglars, sex offenders and others in South Carolina serving as little as 1-10 years -- demonstrates that the South Carolina law casts a much wider net. Contrary to the majority's assertion, then, the South Carolina statute does not, at least with respect to the class of persons affected, "bear[ ] a strong resemblance to the California statute sustained in Morales." Ante at 14.

C

I turn, then, to the second feature of the California statute noted in Morales, the "careful[ ] tailor[ing]" of the Board's authority to relieve it of the "costly and time-consuming responsibility of scheduling parole hearings for prisoners who have no chance of being released." 115 S. Ct. at 1604 (quoting In re Jackson, 39 Cal.3d 464, 473, 216 Cal. Rptr. 760, 764, 703 P.2d 100, 105 (1985)). In all three statutes, the date of the initial parole hearing is unaffected and the substantive standards for eligibility remain the same. But a detailed comparison of the procedures regarding deferrals in California and Virginia on the one hand, and South Carolina on the other, illustrates starkly critical differences.

First, the "default requirement" in Virginia and California is annual review. In California, the Board must conclude that"it is not reasonable to expect that parole would be granted at a hearing during the following years," and it must state the bases for such finding. Morales, 115 S. Ct. at 1604. Similarly, deferrals in Virginia "are not automatic." Hill, 64 F.3d at 169. In other words, every inmate in these states will receive annual hearings unless the Parole Board affirmatively decides that deferral is warranted on the basis of the evidence considered at the last hearing. In South Carolina, however, the default requirement for the affected class of inmates is two years, and there is no provision requiring a finding that deferral is warranted.

Second, deferral decisions in Virginia are subject to appeal at any time during the deferral period. The Supreme Court noted that while

20

the California law was unclear, "the reliability of the Board's [defer-ral] determination may also be enhanced by the possibility of an administrative appeal." Morales, 115 S. Ct. at 1604. Although the majority finds no express statutory restriction on the South Carolina Board's authority to schedule expedited hearings, ante at 15, there is neither evidence in the record nor assertion by the State that such authority exists. In any event, there is clearly no provision for an appeal from the Board's refusal to schedule an expedited hearing. In other words, while the Board might be able to get around the two-year rule, an inmate cannot challenge a decision not to expedite a hearing.

Third, the Supreme Court noted in Morales that the possibility of immediate release after a finding of suitability for parole is largely "theoretica[l]" and that "in many cases, the prisoner's parole release date comes at least several years after a finding of suitability." Id. at 1605; see also In re Jackson, 39 Cal. Rptr. at 474 (noting that several inmate petitions received by that court involved periods between the date of the suitability finding and the proposed release date that varied from three and a half years to nineteen years). **2** There is no reason to believe that anything approaching this situation obtains in South Car-olina. See S.C. Code Ann. § 24-21-645 (providing for a 90-day "pro-visional parole" period prior to release).

D

The amendment to the South Carolina parole statute made another change that has no counterpart in the statutes under consideration in Morales and Hill. When Roller was sentenced in 1983, the parole statute in effect provided for parole upon authorization by a majority of the Board. 1981 S.C. Acts No. 100 § 13. Three years after he was sentenced, the provision was amended to require that at least two-thirds of the Board's members were needed to authorize the parole of persons convicted of a "violent crime," 1986 S.C. Acts No. 462 § 31,

_____

**2** The hearings at issue in Morales involved the suitability for parole. The actual release date, however, is determined by a matrix of facts relat-ing to the crime and victim. According to the State of California, even had Morales been found suitable for parole at the initial hearing, he could not have been released until approximately 2001. See Petitioner's brief, U.S.S.Ct., 1994 WL 596809 *22 n.8.

21

and that two-thirds requirement remains in effect today, codified in § 24-21-645. The practical effect of this is that the inmate must now garner the votes of five Parole Board members rather than a simple majority of four. The majority considers this change apart from the other retrospective changes in the statute and declares that any ex post facto challenge is foreclosed by Dobbert v. Florida, 432 U.S. 282 (1977). I disagree.

As a preliminary matter, I believe that the two-thirds requirement must be considered together with the other changes to the parole statute. See id., 432 U.S. at 294 ("We must compare the two statutory procedures in toto to determine if the new may be fairly characterized as more onerous."). If, as I argue below, the new two-thirds requirement makes parole tougher to attain, then this factor must be examined in conjunction with the amendment's decrease in the frequency of the hearings to determine whether the overall changes to the statute violate the Ex Post Facto Clause.

The majority's view that the two-thirds requirement might actually inure to the inmate's advantage flows from neither Dobbert nor common sense. See ante at 16 ("[P]arole board members might be more likely to vote for granting parole under the two-thirds rule, knowing that any favorable decision must be concurred in by a greater number of their colleagues."). The footnote in Dobbert to which the majority refers, ante at 16 (citing id. at 294 n.7), was merely the Supreme Court's response to the petitioner's argument that the discrete portion of the amendment under consideration -- permitting trial judge review of a jury recommendation of life imprisonment in a capital case -- was more onerous than the prior statute that left the sentencing decision (death or life imprisonment) up to the jury. The Court went on to find that the overall changes, of which trial judge review was only part, "afford[ ] significantly more safeguards to the defendant than did the old [statute]," id. at 295, so much so that the Court characterized the overall changes as "ameliorative." Id. at 294. No one would argue that inmates affected by the South Carolina amendments are now in a better position than they were before the statutory changes.

The majority also notes that Morales compels upholding the two-thirds requirement because to do otherwise would amount to the judi-

22

cial "micromanagement" that the Court cautioned against. <u>Ante</u> at 16. <u>Morales</u> does no such thing. The California statute involved an exceedingly speculative possibility that the punishment of the affected inmates would be increased: The statute applies only to multiple murderers, presumably a small fraction of the inmate population; the Board has to affirmatively decide that a hearing should be deferred and to explain why; the inmate might be able to appeal the deferral decision, and the Board could, of its own volition, advance a hearing date where a change in circumstances warranted; and, significantly, under California's system, the determination of parole suitability often precedes the actual release date by several years. South Carolina's amendments, on the other hand, affect persons convicted of relatively minor crimes; mandate automatic deferrals, with no provision for an administrative appeal; increase the percentage of the Board that must vote to grant parole. In addition, there is no indication that a grant of parole is not ordinarily followed promptly by actual release. If <u>Morales</u> is our guide, the South Carolina statute increases the punishment by decreasing the likelihood of release on parole to a degree that offends the Ex Post Facto Clause.

23